**EXHIBIT A**

**IN THE DISTRICT COURT**
**OF BRAZORIA COUNTY, TEXAS**

| | |
|---|---|
| DAN B. LAIN, TRUSTEE OF THE DUNE PLAN TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES A. WATT; FRANK T. SMITH, JR.; HAL L. BETTIS; AMIEL DAVID; ALAN GAINES; ALAN D. BELL; ALEXANDER A. KULPECZ, JR.; EMANUEL R. PEARLMAN, ERIC R. STEARNS; JOHN R. BRECKER; MARJORIE L. BOWEN; MICHAEL R. KEENER; RICHARD M. COHEN; ROBERT A. SCHMITZ; STEPHEN P. KOVACS; STEVEN BARRENCHEA; STEVEN M. SISSELMAN; AND WILLIAM E. GREENWOOD,<br><br>Defendants. | **CAUSE NO. ____________________**<br><br>**______________ JUDICIAL DISTRICT**<br><br>**DEMAND FOR JURY TRIAL** |

# PLAINTIFF'S ORGINAL PETITION

Samuel Stricklin
Texas State Bar No. 19397050
**Stricklin Law**
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, TX 75082
Telephone: (972) 238-8687
Cell: (469) 601-4601
Email: sam.stricklin@stricklaw.pro

*Counsel to Plaintiff Dan B. Lain,*
*Trustee of the Dune Plan Trust*

## TABLE OF CONTENTS


I. JURISDICTION AND VENUE ........ 1

II. Discovery Control Plan ........ 1

III. PARTIES ........ 1

A. Plaintiff ........ 1

B. Defendants ........ 2

(1) Officer Defendants ........ 2

(2) Director Defendants ........ 3

IV. NATURE OF THE ACTION ........ 5

C. Failure to Perform Diligence of Environmental Liabilities In Goldking Acquisition ..... 7

D. Goldking's Overstated Projections Results in Overpayments ........ 10

E. Continued Mismanagement of Environmental Liabilities Following Goldking Acquisition ........ 11

F. Second Lien Holders Control the Board of Directors and Lack of Independence ........ 13

G. Insufficient Assessment and Initial Patent Rejection of EPL Offer as well as Overarching Rejection of Certain Similar Offers ........ 14

H. Inflation of Reserves and Negligence by Board in Reviewing Same ........ 16

I. Focus on Self-Interested Transactions ........ 17

J. Failure to Consummate Viable Transactions with Other Parties ........ 19

K. D&O Defendants' Negligence and Mishandling Bring about Downfall of Dune ........ 20

L. Plaintiff Brings Causes of Action Against the Defendants To Recover the Losses Suffered By Creditors ........ 20

V. FACTUAL ALLEGATIONS ........ 21

A. Goldking Acquisition ........ 21

(1) Dune Assumes Mystery Sheen Environmental Liabilities from the Goldking Acquisition ........ 22

(2) Dune Overpaid for Goldking Due to Overstated Reserves and Projections ........ 25

B. Directors and Officers Persistently Fail to Appropriately Address and Monetarily Quantify the Amount of Environmental Liabilities ........ 26

C. Directors Lack Independence and Are Collectively Dysfunctional due to their Conflicts 33

D. Board Fails to Consummate Viable Acquisition Offer from EPL and Instruct Management Not to Entertain Other Plausible Deals ........ 41

E. Management Pursues Self-interested Transactions with Eos and Shoreline ........ 45

F. Management Negotiate Personal Side Deal with Eos in Show of Blatant Disregard for Dune's Other Stakeholders ........ 50

G. Management's Pursuit of Self-Interested Transactions Result in Failure to Consummate Viable Acquisition Offers from Other Parties ........ 52

H. Dune's Bankruptcy Proceeding, Confirmation of Plan of Liquidation, And Creation of Plan Trust ........ 55

**COUNT I (Breach of Statutory Fiduciary Duty -- Texas Bus. Org. Code §21.401; Against Director Defendants)** ........ 56

**COUNT II (Breach of Statutory Fiduciary Duty – Texas Bus. Org. Code §21.401; Against Officer Defendants)** ........ 56

**COUNT III (Breach of Statutory Fiduciary Duty – Delaware General Corporation Law §141(a); Against Director Defendants)** ........ 57

**COUNT IV (Breach of Statutory Fiduciary Duty – Delaware General Corporation Law §141(a); Against Officer Defendants)** ........ 58

**COUNT V (Common Law Breach of Fiduciary Duty; Against Director Defendants)** ........ 59

**COUNT VI (Common Law Breach of Fiduciary Duty; Against Officer Defendants)** ........ 60

**COUNT VII (Breach of Duty Not to Make Improper Use of Information to Gain Improper Advantage; Against Officer Defendants)** ........ 61

**COUNT VIII (Violation of the Trust Fund Doctrine; Against All D&O Defendants)** ........ 62

**COUNT IX (Corporate Waste; Against Director Defendants)** ........ 62

**COUNT X (Corporate Waste; Against Officer Defendants)** ........ 63

**COUNT XI (Negligence; Against All D&O Defendants)** ........ 63

**COUNT XII (Assumpsit; Against All D&O Defendants)** ........ 64

**COUNT XIII (Unjust Enrichment; Against Director Defendants)** ........ 64

**COUNT XIV (Unjust Enrichment; Against Officer Defendants)** ........ 65

**COUNT XV (Constructive Fraudulent Transfer – 11 U.S.C. §§544(b), 548(a)(1)(B), 550, 551 and as applicable Texas Bus. & Com. Code §24.005(a)2; Against All D&O Defendants – Constructive Fraud)** ........ 66

**COUNT XVI (Constructive Fraudulent Transfer – 11 U.S.C. §§544(b), 548(a)(1)(B), 550, 551 and as applicable 6 Del. C. §1304(a)(2); Against All D&O Defendants – Constructive Fraud)** ........ 67

**COUNT XVII (Conduct Ultra Vires; Against Defendant Robert A. Schmitz)** ........ 68

**PRAYER FOR RELIEF** ........ 69

Plaintiff Dan Lain, in his capacity as Plan Trustee ("***Plaintiff***" or "***Plan Trustee***") of the Dune Plan Trust (the "***Trust***"), by and through his undersigned counsel, alleges, upon knowledge and/or information and belief, as follows:

## I. JURISDICTION AND VENUE

1. Dan Lain, Trustee is a Texas resident, as are numerous beneficiaries of the Trust. Upon belief, numerous of the defendants herein are Texas residents. This matter seeks damages for breach of duties, violation of trust fund doctrine, corporate waste, negligence, assumpsit, unjust enrichment, constructive fraudulent transfers under federal and state law, and violation of ultra vires doctrine.

2. The principal location of Dune's Texas assets was in Brazoria County. Venue is appropriate in this matter pursuant to chapter 15 of the Texas Practice and Remedies Code, including specifically section 15.02.

3. The information with respect to these matters was not reasonably discovered until Dan Lain became Trustee in this matter. Moreover, all claims asserted were dominated by parties with an adverse interest in bringing same.

## II. DISCOVERY CONTROL PLAN

4. For purposes of Rule 190.1, Plaintiff alleges that this matter is subject to Discovery Level 2 in accordance with Texas Rule of Civil Procedure 190.3; however, Plaintiff reserves the right to request entry of an order establishing a Level 3 discovery control plan.

## III. PARTIES

### A. Plaintiff

5. Plaintiff Dan Lain is the Plan Trustee of the Plan Trust, created pursuant to the confirmed chapter 11 bankruptcy plan of Dune.

**B. Defendants**

6. The Defendants listed below collectively constitute the "***D&O Defendants***."

**(1) Officer Defendants**

7. Defendant James A. Watt ("***Watt***") served as President and Chief Executive Officer of Dune from April 2007 through 2015. Defendant Watt can be served with process at Warren Resources – Two Lincoln Centre 5420 LBJ Freeway Suite 600, Dallas, Texas 75240 and at 3711 Willowick Road, Houston, Texas 77019.

8. Defendant Frank T. Smith, Jr. ("***Smith***") served as Chief Financial Officer and Senior Vice President of Dune from April 2007 through 2015. Defendant Smith can be served with process at Warren Resources – Two Lincoln Centre 5420 LBJ Freeway Suite 600, Dallas, Texas 75240.

9. Defendant Hal L. Bettis ("***Bettis****")* served as Dune's Executive Vice President, Business Development and Environmental Affairs, and Chief Operating Officer from May 2007 through 2015. From 2004 through 2007, Bettis also served as Executive Vice President of Operations of Goldking prior to Dune's acquisition of Goldking in May 2007. Defendant Bettis can be served with process at 13511 Winter Creek Court, Houston, Texas 77077 and 8803 Aberdeen Park Drive, Houston, Texas 77095 and at 10 W. Terrace Drive, Houston, Texas 77007-7039.

10. Defendant Amiel David ("***David***") was the Senior Advisor to the Board of Dune from April 2007 to March 2009. Defendant David can be served with process at Amrich Energy, Inc. – 3201 Airpark, Suite 201, Santa Maria, California 93455 and at 361 W. 52nd Street Apt. 2, New York, New York 10019.

11. Watt, Smith, Bettis, and David are collectively referred to hereinafter as the "***Officer Defendants***."

**(2) Director Defendants**

12. Defendant Alan Gaines ("***Gaines***") was a former executive chairman of the Board of Dune and served on the Board from April 2007 through January 2012. Defendant Gaines can be served with process at Eos Petro Inc. – 1999 Avenue of the Stars, Suite 2520, Los Angeles, California 90067.

13. Defendant Alan Bell ("***Bell***") served on the Board from April 2007 through January 2012. Defendant Bell can be served with process at 10222 Daria Drive, Dallas, TX 75229.

14. Defendant Alexander A. Kulpecz, Jr. ("***Kulpecz***") served on the Board from January 2012 through March 2015. Director Kulpecz can be served with process at 26 Milan Estates, Houston, Texas 77056.

15. Defendant Emanuel R. Pearlman ("***Pearlman***") served on the Board from January 2012 through January 2013. Director Pearlman can be served with process at 40 E. 88th Street, New York, New York 10128.

16. Defendant Eric R. Stearns ("***Stearns***") served on the Board from January 2012 through March 2014. Director Stearns can be served with process at 8653 E. Iliff Drive, Denver, Colorado 8023.

17. Defendant John R. Brecker ("***Brecker***") served on the Board from March 2013 through March 2015. Defendant Brecker can be served with process at 277 W. End Avenue Apt. 4D, New York, New York 10023.

18. Defendant Marjorie L. Bowen ("***Bowen***") served on the Board from March 2013 through March 2015. Defendant Bowen can be served with process at 225 6th Street, Manhattan Beach, California 90266 and at 11413 Spur Wheel Lane, Potomac, Maryland 20854.

19. Defendant Michael R. Keener ("***Keener***") served on the Board from January 2012 through March 2015. Defendant Keener can be served with process at 3303 Acorn Wood Way, Houston, Texas 77059.

20. Defendant Richard M. Cohen ("***Cohen***") served on the Board from April 2007 through January 2012. Defendant Cohen can be served with process at 100 East Hartsdale Avenue, Hartsdale, New York 10530 and at 309 Parkside Drive, Suffern, New York 10901.

21. Defendant Robert A. Schmitz ("***Schmitz***"") served on the Board from January 2012 through March 2015. Defendant Schmitz can be served with process at 34 Seville Avenue, Rye, New York 10580.

22. Defendant Stephen P. Kovacs ("***Kovacs***") served on the Board from January 2012 through January 2013. Defendant Kovacs can be served with process at 556 Forest Avenue, Rye, New York 10580.

23. Defendant Steven Barrenchea ("***Barrenchea***") served on the Board from April 2007 through January 2012. Defendant Barrenchea can be served with process at 12 Ajax Place, Berkeley, California 94708.

24. Defendant Steven M. Sisselman ("***Sisselman***") served on the Board from April 2007 through January 2012. Defendant Sisselman can be served with process at ITERA International Energy Corporation – 9995 Gate Parkway North, Jacksonville, Florida 32246 and at 24 Cedar Springs Lane, Needham, Massachusetts 02492.

25. Defendant William E. Greenwood ("***Greenwood***") served on the Board from April 2007 through January 2012. Defendant Greenwood can be served with process at 40 Wyck Hill Lane, Westlake, Texas 76262-8554.

26. Defendant Watt served as President and Chief Executive Officer of Dune from April 2007 through 2015 as well as on the Board for a segment of this period. Defendant Watt can be served with process at Warren Resources – Two Lincoln Centre 5420 LBJ Freeway Suite 600, Dallas, Texas 75240 and at 3711 Willowick Road, Houston, Texas 77019.

27. Gaines, Bell, Kulpecz, Stearns, Brecker, Bowen, Keener, Cohen, Schmitz, Kovacs, Barrenchea, Sisselman, Greenwood, and Watt are collectively referred to hereinafter as the "***Director Defendants***."[1]

## IV. NATURE OF THE ACTION

28. This is an action brought by Plaintiff to recover the enormous losses caused to Dune Energy, Inc. (together with Dune Operating Company and Dune Properties, Inc., "***Dune***," or the "***Debtors***") and its creditors by its former directors and senior officers (i.e., the Director Defendants and the Officer Defendants, and collectively, the D&O Defendants), liable for their breach of fiduciary duty to the Debtors including certain blatant acts of self-interest to the detriment to the Debtors and their creditors. These actions caused or contributed to Dune's bankruptcy, which was commenced in the United States Bankruptcy Court for the Western District of Texas (the "***Bankruptcy Court***") on March 8, 2015 (the "***Petition Date***").

29. Dune was a Houston-based oil and gas company that had small-scale operations prior to 2007 and then grew immensely in conjunction with its acquisition (the "***Goldking Acquisition***") of Goldking Energy Corporation ("***Goldking***") in May 2007. On April 18, 2007, Dune announced that it had entered into a *Stock Purchase and Sale Agreement* dated effective April 13, 2007 to acquire all of the issued and outstanding shares of common stock of Goldking

[1] To the extent that an Officer Defendant served on Dune's Board of Directors, he is also included within the grouping of Director Defendants.

Energy Corporation for $320.5 million. Prior to the Goldking acquisition, Dune was a company with assets of just $51 million and annual revenues of less than $8 million.

30. Dune made several mind-boggling blunders in consummating the Goldking Acquisition, including but not limited to: (a) buying a brackish water oil and gas field that had a "Mystery Sheen" on it, plainly reflecting for all to see a serious environmental problem; (b) buying the field via a stock purchase, thereby assuming all liabilities of the field; (c) buying the field based on a second hand account of an "oral representation" of a Coast Guard representative that a third-party was liable for the Mystery Sheen; (d) failing to get a written determination of such liability prior to closing; (e) failing to obtain some reduction, hold-back or escrow of a significant part of the purchase price pending such determination; and (f) failing to perform adequate due diligence regarding the transaction and instead electing to pay the full purchase price at an early closing.

31. The D&O Defendants breached their duty of care by failing to act in good faith, failing to undertake reasonable and necessary due diligence, failing to act on an informed basis in the discharge of their duties, as well as making numerous imprudent decisions concerning the business affairs of the Debtors. As will be discussed in detail in this Petition, the D&O Defendants failed to understand and numerically quantify the Debtors' extraordinary environmental liabilities (initially assumed under its acquisition of Goldking in May 2007) which placed a shadow of uncertainty around any potential value of the assets and likely caused Dune to be insolvent immediately following the closing of the transaction. The D&O Defendants' failures in acknowledging Dune's insolvency due to their negligence in performing diligence into the Debtors' environmental liabilities caused them to make extremely important decisions – such as evaluating offers to sell the company or to assume further debt – based on incomplete information to the harm of the company. The Officer Defendants also engaged in self-dealing transactions, in

breach of their duty of loyalty to the Debtors which suffered due to the Officer Defendants' failures in consummating other plausible value-enhancing transactions in the best interest of the company. These acts and others discussed in this Petition occurred from approximately 2007 through the Petition Date of March 8, 2015.

### C. Failure to Perform Diligence of Environmental Liabilities In Goldking Acquisition

32. Dune failed to appropriately evaluate the environmental liabilities associated with the Mystery Sheen as well as the plugging and abandonment liabilities assumed by Dune resultant from its ownership of 200 unplugged wells following the Goldking acquisition.[2] The D&O Defendants acted negligently in rapidly consummating the acquisition, thereby exposing Dune to enormous environmental liabilities that were not properly or accurately performed diligence upon, quantified, acknowledged and/or disclosed to key stakeholders. The *Stock Purchase and Sale Agreement* pursuant to which Dune acquired Goldking provided Dune the right to conduct title and environmental due diligence on Goldking's oil and gas fields and to assert any material title and environmental defects.[3] The purchase price was to be reduced with respect to any uncured title defects and unremedied environmental defects to the extent that such aggregate values exceeded $5 million, and the deal may have been terminated if defects totaled more than $32.05 million.

33. At the time of the Goldking acquisition in 2007, the Mystery Sheen existed and was known to numerous involved parties, including the Officer Defendants, as it had been discovered in September 2005 after Hurricane Katrina passed over Garden Island Bay the month prior. Upon their discovery, the Mystery Sheen liabilities were always the responsibility of Goldking,

---

[2] Watt Deposition p. 117: Question Posed: "*200. How did – how did the debtors end up with so many wells that needing to be* –" Watt's response: "*It was part of what we bought in 2007 when we bought the assets from Goldking*"

[3] Dune Schedule 14C filed with SEC May 21, 2007

transferring to Dune following its acquisition of Goldking, and any party that properly performed diligence into the Mystery Sheen would have found the United States Coast Guard and other authorities' position that whomever was the lessee of the "Area of Concern" was the responsible party for the remediation, as the "*OPA 90 regulations… assign responsibility to the lessee.*"[4] Furthermore, the authorities' position was that complete remediation was necessary rather than simple management. From the same June 11, 2006 memorandum: "*When advised what 'cleaned up' means, they advised that it means excavating out all of the contaminated soil.*" This was also officially ordered in the Administrative Order issued by the USCG which instructed Dune to "*immediately contract an Oil Spill Removal Organization to remove, and contain all pollution at this site*" and to address "*the removal of all oil and contaminated substrate on or below the surface of the water at Garden Island Bay*."[5] The requirements by the authorities were clear, and the D&O Defendants blatantly failed in their duties to Dune and its creditors in attempting to apply a "band-aid" approach to the Mystery Sheen liabilities.

34. The Officer Defendants owed a fiduciary duty to all stakeholders of Dune, but proceeded with the Goldking Acquisition recklessly and quickly, without performing appropriate diligence or risk assessment, thereby rendering Dune insolvent. Upon information and belief, Dune closed the Goldking Acquisition on May 15, 2007, two weeks ahead of the scheduled closing date of May 28, 2007, and without any purchase price adjustments, whereby Dune ultimately paid $310.5 million in cash and 10,055,866 shares of Dune's common stock valued at $18 million for total consideration of $328.5 million.[6]

---

[4] June 11, 2006 Memorandum from Casey Jones (Goldking) to Hal Bettis dated June 11, 2006 Re: Garden Island Bay Mystery Sheen Status Report and Path Forward

[5] *Administrative Order Number 001-09* issued August 28, 2009 by U.S. Department of Homeland Security and United States Coast Guard

[6] Note 4 to Consolidated Financial Statements – Dune Form 10-K for year ended December 31, 2007

35. Dune relied on the misrepresentations made by Goldking's management regarding the Mystery Sheen, and Goldking's management engaged in self-interested acts by misrepresenting the full extent of the Mystery Sheen. Prior to the Goldking Acquisition, Dune engaged Engelken & Associates, L.P. ("***E&A***") to perform an environmental assessment of Goldking's assets. The report contains the following information regarding the Mystery Sheen:

> "*In a meeting with Goldking, on April 27, 2007; E&A was advised that the United States Coast Guard (USCG) recently (April 2007) issued Shell a Notice of Designation naming them the party at fault for the mystery sheen…* ***Mr. Hal Bettis*** *provided E&A a copy of the documented study and explained the current status; stating the USCG had sent Shell Oil Company's pipeline subsidiary a Notice of Designation regarding the sheen and that a meeting during the first week in May would set the cleanup in motion.*"[7] (emphasis added).

36. The environmental report solely relied on the representations of Goldking's management, explicitly depending upon the account of Hal Bettis who became Chief Operating Officer of Dune following the Goldking Acquisition, rather than direct communications with the USCG in obtaining an update on the status of the Mystery Sheen liabilities. Thus there was no benefit to Dune in relying on a third party to objectively assess Goldking's environmental liabilities when they were also dependent upon the same misrepresentations of Goldking's management.

[7] *Environmental Assessment Update: Goldking Operating Company Assets* prepared for Dune Energy, Inc. by Engelken & Associates, L.P.

**D. Goldking's Overstated Projections Results in Overpayments**

37. Even without considering the substantial environmental liabilities that Dune assumed as part of the Goldking Acquisition, Dune significantly overpaid for Goldking. Following Dune's purchase of Goldking, the consolidated entity performed far below the expectations that were provided in pro forma reserve estimates projected prior to the acquisition, despite the sharp rise in 2007 and 2008 commodity prices compared to projections.[8]

38. It is also apparent that after having made these blunders, the D&O Defendants either ignored them or, worse yet, potentially undertook a continuing now-discovered long term effort to downplay their severity. The directors' and officers' inadequate acquisition-related diligence of Goldking would be exacerbated by their continued lack of duty and care which could be viewed as incompetence, as discussed below, consequently resulting in their signing of questionable certificates and delivering same to The Bank of Montreal ("***BMO***"), which provided debt financing to Dune for more than four years following the Goldking Acquisition based on incomplete information – i.e., Dune's vastly understated environmental liabilities and largely overstated reserve reports.

39. Dune consistently received mid-year reserve audits from DeGolyer and MacNaughton ("***D&M***") until 2014 after which time the audits from D&M remained as preliminary and not finalized, which is a questionable and not common practice for a publicly-traded company. The third-party reserve audits were supplemented by Dune at the end of each calendar year by internal roll-forwards, which is, in itself, a fairly common industry practice that was probably required by the Debtors' financial auditors. The most questionable aspect of Dune's reserves is the continued retention of proved undeveloped reserves ("***PUDs***") on the Debtors'

---

[8] *Pro Forma Reserve Estimates* from Dune Form 8-K filed on April 30, 2007 and Form 10-Ks for 2007 and 2008

books when such reserves are required by the Securities and Exchange Commission ("***SEC***") to be removed after five years if not drilled in that timeframe *or* are to be questioned if (a) the company does not have sufficient capital to develop those reserves, and (b) if recent history demonstrates that such reserves are unlikely to be developed in the near-term.

**E. Continued Mismanagement of Environmental Liabilities Following Goldking Acquisition**

40. The D&O Defendants continuously failed to quantify and fully analyze the extent of the environmental liabilities. Throughout the years following the Goldking Acquisition, the environmental issues were raised at the board level on numerous occasions; however, there remained consistently little follow through by either the Director Defendants or the Officer Defendants to quantify the full magnitude of the liabilities which required a full mediation of the Mystery Sheen, according to the US Coast Guard and governmental requirements. Rather, they focused on a "band-aid approach" in addressing the issues. Furthermore, because they never fully understood and addressed the liabilities, the D&O Defendants continued to make poor decisions surrounding any sale processes, dismissing favorable offers of purchase to the detriment of the Debtors and the Debtors' creditors. The D&O Defendants failed to appreciate – either because they did not pursue the required information related to the actual magnitude of the environmental liabilities or because they were focused on trying to benefit the equity holders, which many of them represented – that Dune was insolvent and that they should have been acting on behalf of Dune's creditors rather than its equity holders.

41. The Officer Defendants' approach was to downplay the environmental liabilities and to attempt to assure all parties that the problems could be handled. Furthermore, because of their own negligence, the Director Defendants were likely unaware of the true extent of the environmental liabilities or were operating under the apparent belief that the environmental

liabilities were not a major problem and could generally be managed around, in direct contrast to what the governmental agencies required. Therefore, this belief clouded Dune's business judgment and decision making during the duration of the company's post-Goldking history, which ended with Dune's bankruptcy filing on March 8, 2015.

42. The D&O Defendants' failure to properly monetarily quantify the full amount of and address the environmental liabilities negatively impacted Dune and its creditors in serious ways. The lack of acknowledgement by management of the environmental liabilities caused Dune to forego multiple opportunities to monetize its assets that would have resulted in full or materially better recoveries for Dune's creditors. Numerous potential transactions were ultimately cancelled due to the interested party's investigation into and refusal to assume the environmental liabilities at all or at a price the D&O Defendants required. As discussed below, Energy Partners, Ltd., now known as EPL Oil and Gas, Inc. (*"**EPL**"*) considered an acquisition of Dune for a significant length of time but ultimately cited their unwillingness to take on the environmental liabilities as a reason for losing interest in the transaction. Red Mountain Resources, Inc. also reneged on a potential transaction with Dune due to Dune's environmental liabilities.[9] Additionally, EnerQuest submitted a letter of intent in September 2014; however, EnerQuest wanted to exclude the Garden Bay Island field, the location of the Mystery Sheen, from the purchase.[10]

43. Numerous sources indicate that the actual figure for the Mystery Sheen environmental liabilities may be upwards of $50 million, and this is supported by the fact that several strategic, informed oil and gas companies operating in Dune's same space were unable or unwilling to enter into a transaction with Dune due to their refusal to assume the company's

---

[9] July 10, 2014 Email from Red Mountain Resources, Inc. to James Watt

[10] Watt Deposition p.168.

environmental liabilities. The D&O Defendants should have performed similar analyses and risk assessments prior to the closing of the Goldking acquisition. After failing to do so, the D&O Defendants should have then endeavored to comprehend and properly quantify and communicate the liabilities, such that they could suitably assess and make proper and well-informed judgments regarding any one of the numerous acquisition offers and other strategic and financing decisions they faced.

### F. Second Lien Holders Control the Board of Directors and Lack of Independence

44. The Director Defendants, rather than confront these issues, opted instead to restructure some limited liabilities of Dune in December 2011. The restructure did not address the real and significant issues with Dune, including the environmental issues. Instead, the restructure placed the then-second lien holders in control of Dune's board of directors (the "***Board***" or the "***Board of Directors***") to the detriment of the enterprise and other creditors. It is apparent the Board was fractured and dysfunctional and unable to make appropriate decisions for the benefit of all stakeholders, including its analysis of environmental liabilities and whether and how to proceed with the EPL transaction, as discussed below.

45. At various times, many of the Director Defendants were appointees of or had ties to the second lien lenders who were also Dune's equity holders. This created chaos in the operation of the Board and negatively influenced Dune management as well, as the directors were prone to switching between their second lien hat and equity hat, depending on which position benefited them more given the circumstances.

46. There are numerous instances in which the dysfunctions of the Board resulted in the D&O Defendants' poor decisions, inability to address Dune's issues, conflicts of interest, and other improper actions that caused harm to Dune and its creditors. The Board's composition as

agents of various constituents with largely differing interests and therefore ideas rendered the directors and the officers ineffective in competently governing the company and prohibited them from forming and making cohesive strategic and value-enhancing decisions.

47. Furthermore, Dune's environmental liabilities were so substantial that they caused Dune to be insolvent on a continuing basis, during this entire period. Therefore, the Director Defendants had a fiduciary duty to the company's vendors and other creditors to ensure their recovery would be maximized. However, in their efforts to solely and unjustifiably represent the company's shareholders and their own self-interests, the Director Defendants were reckless in their attempts to attain high returns, essentially gambling with Dune and driving the company to financial ruin that culminated in its bankruptcy and successive meager recovery for creditors.

### G. Insufficient Assessment and Initial Patent Rejection of EPL Offer as well as Overarching Rejection of Certain Similar Offers

48. In early 2012, EPL expressed interest in potentially acquiring the stock of Dune at \$4.00 to \$4.50 per share, which represented an 18% to 32% premium over the then trading price.[11],[12] Although diligence had not been performed by EPL on Dune at the time of the offer in early 2012, on February 16, 2012, the Board instructed Dune to flatly reject the offer and any similar expressions of interest that may have come from other parties. An offer that presents an 18% to 32% premium over stock price should be considered at all times, and more significantly, this offer was an especially important one that the Board should have considered due to Dune's immense environmental liabilities, which essentially caused the company to be insolvent. The Board and officers may or may not have actually been aware of the actual size of the environmental liabilities.

[11] *Minutes of the Meeting of the Board of Directors of Dune Energy, Inc. Held on February 16, 2012*

[12] Share price as of February 16, 2012 as obtained from S&P Capital IQ.

If they were not aware, they breached their duties of care to obtain the proper material information so that they could make informed decisions in the best interest of the Debtors. If the D&O Defendants were aware of the actual costs of the liabilities, they fraudulently misrepresented them to the Debtors' various constituents.

49. However, while dialogue between Dune and EPL continued, it seems that the deal ultimately did not progress because EPL could not meet Dune's demands in terms of amount and form of consideration for Dune's stock, as Dune's position was that EPL's purchase offer of cash did not offer the upside Dune was seeking.[13]

50. The acquisition expression of interest, which as portrayed to the Board as potentially falling between $4.00 and $4.50 per share, was well in excess of the market price of Dune at the time, which was $3.40 per share,[14] and represented a premium of 18% to 32% over the then-current Dune stock price, clearly adding value to Dune stakeholders. Furthermore, EPL, as an independent oil and natural gas exploration and production company publicly traded on the New York Stock Exchange, was a well-capitalized, strategic acquirer that had the ability to close a transaction with Dune. Thus, the Board breached its fiduciary duty of care by failing to appropriately consider the offer, instructing Watt to inform the party it was "not interested."

51. Even more alarmingly, the Director Defendants instructed management to ignore and not seek any offer that was below an unrealistically high level. An excerpt of the February 16, 2012 Minutes reads: "*The Board then indicated that Mr. Watt should generally be prepared to provide a similar response to comparable expression for the immediate future.*"[15] The Director Defendants' blanket instruction to ignore all offers was given without inadequate knowledge due

---

[13] March 13, 2012 Email from James Watt to Bob Schmitz titled "EPL."

[14] Share price as of February 16, 2012 obtained from S&P Capital IQ

[15] *Minutes of the Meeting of the Board of Directors of Dune Energy, Inc. Held on February 16, 2012*

to their neglect and failure to do nearly enough "homework" about Dune's operations and prospects in general and its environmental problems specifically in direct violation of their fiduciary duties. Those actions would later doom the company and its creditors.

### H. Inflation of Reserves and Negligence by Board in Reviewing Same

52. Dune undertook an effort to artificially increase its balance sheet by not only retaining questionable PUDs but by increasing its PUDs. Dune improperly selected wells to drill or workover based not upon realizing value, but instead based on increasing PUDs on its balance sheet. Investment decisions during the 2012 and 2013 time period were made on sub-par industry decision matrices, and in cases where Dune was not the operator of certain wells, the Debtors should have chosen to go non-consent, as was their right by contract, if the investment appeared to be less than optimum. The problems for Dune were further exacerbated in that same period by cost overruns of 24% and 16% above authorization for expenditures ("***AFEs***") for 2012 and 2013 respectively. Dune began to record and report contingent resources in its D&M audited reserve reports and started a campaign of "swinging for the fence" by participating in high-risk exploration drilling at the Debtors' Garden Island Bay and Leeville assets when they could ill afford the costs and when some of the aforementioned cost overruns were associated with these ill-advised ventures. Dune was at the mercy of two other operators, Manti and Shoreline, which Watt described as "*very aggressive*" in a memo to the Board on April 26, 2012.[16] Dune reported Indicated Reserve Costs, which is not common terminology in the oil patch, and while such reported numbers appeared to be acceptable at less than $15 per barrel of oil equivalent, those same numbers did not include all costs associated with getting the reserves out of the ground, such as operating expenses and production taxes. Dune published reserve reports that included

[16] Memo from James Watt to the Board "Re: Major Transaction update" dated April 26, 2012

unrealistic management projections of the costs associated with producing such PUDs. In so doing, Dune created the financial illusion of value where no real value existed. The Board also failed to perform any diligence on the true value of the reserves or to have considered in detail the content of the reserve reports, even though the Board was aware that such reports were being provided to lenders with the expectation that lenders would rely upon them.

**I. Focus on Self-Interested Transactions**

53. Dune had several other opportunities for a sale of all or parts of its business, specifically beginning in 2014 during which period Perella Weinberg Partners was hired to conduct a sale process. For self-interested reasons, of which there are many, the Officer Defendants chose to pursue a transaction with Eos Petro, Inc., ("***Eos***") which lacked the financial wherewithal to close a transaction, and which pursuit by the Officer Defendants precluded management from pursuing other transactions that would have resulted in better recoveries for Dune stakeholders.

54. As was apparent all along based on Eos's precarious financial condition (details of which were publicly available) and lack of available financing, Eos was never capable of closing the transaction with Dune. Although the offer from Eos did not have a financing contingency, there was no actual recourse for Dune if Eos failed to close the transaction. Despite the illusion of a reverse termination fee of $5.5 million, which was Dune's sole remedy for Eos's failure to obtain financing, in actuality Eos had no means to pay such a fee, a fact that was known to the Officer Defendants, as discussed in the *Oral and Videotaped Rule 2004 Deposition of James A. Watt May 11, 2015* (the "***Watt Deposition***").[17]

[17] Watt Deposition p. 148

55. It is further notable that Eos had failed in other attempted transactions leading up to its failure with Dune; however, the Officer Defendants were enticed through their own self-interests to dedicate and waste Dune's resources in attempting to move forward with Eos.

56. Even more damning is that in the midst of structuring the Eos transaction, the Officer Defendants prearranged for a side deal that would provide for their transition to Eos in the event that Dune was sold to another firm. Specifically, in an email dated May 16, 2014 from Steve Craig (Dune) to James Watt, attached was a red-line document, "EOS PETRO.docx," which was a document titled, "EOS PETRO, INC Corporate Development Plan May 2014" that detailed the Officer Defendants' proposal of a corporate development plan that provided for Eos Petro to create a Houston-based corporate team, which would be comprised of James Watt as President and CEO, Frank Smith as CFO, Steve Craig as Sr. VP of Investor Relations / Administration, charged with developing the infrastructure for a NYSE listing of Eos Petro.[18]

57. Furthermore, in addition to Eos's offer to acquire Dune, and management's calculating side deal with Eos, the Director Defendants also expended considerable time on entertaining a possible – though ultimately unconsummated – merger with Shoreline, likely due to the allure of retaining their executive positions in the new consolidated company where Watt and Smith were to retain their respective position of CEO and CFO and existing Shoreline management was to fit in with Dune's organization.[19] The Officer Defendants' preoccupation with pursuing transactions that would provide some benefit to them through their continual employment and other means constitute a breach of fiduciary duty to Dune which caused considerable damage to the Debtors and their estate.

---

[18] May 16, 2014 Email from Steve Craig (Dune) to James Watt (Dune CEO) with red-lined attachment "EOS PETRO.docx"

[19] Watt Deposition p. 76

**J. Failure to Consummate Viable Transactions with Other Parties**

58. In focusing their attentions only on those deals that provided personal benefits, the Officer Defendants failed to pursue and consummate viable transactions with other parties to the harm of Dune and its creditors. Additionally, the D&O Defendants' failure to quantify the environmental liabilities caused the Director Defendants to inadequately and erroneously assess transactions, viewing many positive transactions as inferior because of their underestimation of the environmental liabilities. While management was pursuing the self-interested deal with Eos, it declined to move forward with prospects that included a July 2014 offer from White Marlin for $70 million,[20] which was $51 million more than the $19 million[21] that Dune's assets ultimately sold for via 363 Sales during the bankruptcy cases.

59. Additionally, in July 2014, Whitney Oil and Gas, LLC made a $30 million offer[22] for Dune's Garden Island Bay and Bateman fields, which ultimately sold to Whitney's affiliate, Trimont Energy (NOW), LLC, for a single dollar[23] via a 363 Sale during the bankruptcy cases, representing $30 million more than ultimately received by Dune stakeholders.

60. In mid-2014, Dune was in negotiations to receive private equity funding from Morgan Stanley; however, Dune's management halted the discussions due to the requirement that officers contribute their own money.[24] Thus, due to management's unwillingness to provide and

---

[20] White Marlin Offer Letter dated July 11, 2014 sent to Stephen E. Conner of Perella Weinberg Partners. The letter was attached to an email sent from Mr. Conner to James Watt on July 11, 2014.

[21] Docket #379 – Order (A) Approving Purchase Agreement (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, Interests, and (C) Granting Related Relief [White Marlin Oil and Gas Company LLC] page 6 para M

[22] DUNE00010362 – "Overview of M&A Proposals Received" prepared by Perella Weinberg Partners as well as July 1, 2014 email from Frank Smith to James Watt titled "RE: Whitney offer."

[23] Docket #378 – Order (A) Approving Purchase Agreement (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, Interests, and (C) Granting Related Relief [Trimont Energy (NOW), LLC]

[24] Watt Deposition p. 148: Question Posed: "*What happened with Morgan Stanley negotiations at this point? Had they stalled?*" Watt's response: "*Yes*" Question Posed: "*And that was because of their requirement that the management put in their own money?*" Watt's response: "*Yes.*"

risk their own funds, Dune was unable to accept a capital infusion that would have greatly benefited the company.

61. In December 2014, White Marlin made a $30 million offer for all Dune assets excluding Garden Island Bay and Bateman,[25] which White Marlin ultimately purchased via a 363 Sale for $19 million. Had Dune proceeded with White Marlin in December 2014, Dune stakeholders would have recovered $11 million more than ultimately received.

### K. D&O Defendants' Negligence and Mishandling Bring about Downfall of Dune

62. The actions discussed above culminated in Dune's demise, and on March 8, 2015, Dune filed a voluntary petition pursuant to chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors' estates currently face well over $100 million in unpaid claims that were all proximately caused by the breaches of fiduciary duty and other actionable conduct set forth in this Petition. Additionally, the Debtors' estates incurred millions in professional fees and costs in its Chapter 11 proceeding that also were all proximately caused by the breaches of fiduciary duty and other actionable conduct set forth in this Petition.

### L. Plaintiff Brings Causes of Action Against the Defendants To Recover the Losses Suffered By Creditors

63. Plaintiff brings causes of action against the D&O Defendants, listed below, who improperly benefitted from these wrongful activities. Plaintiff alleges 17 causes of action against these defendants, including:

- Actual and constructive fraudulent transfers and obligations under federal and state law;

[25] White Marlin Offer Letter dated December 31, 2014 sent to Stephen E. Conner of Perella Weinberg Partners. The letter was attached to an email sent from Mr. Conner to James Watt on December 31, 2014.

- Breaches of fiduciary duty;
- Unlawful distributions, corporate waste, negligence, violation of trust fund doctrine, and unjust enrichment.

64. The D&O Defendants breached their duties of due care and loyalty to Dune, engaged in repeated acts of self-dealing, and continuously acted recklessly and negligently to the detriment of Dune and its creditors.

## V. FACTUAL ALLEGATIONS

### A. Goldking Acquisition

65. Dune acquired Goldking pursuant to a *Stock Purchase and Sale Agreement* ("***SPSA***") dated effective April 13, 2007 to acquire all of the capital stock of Goldking, an independent energy company focused on the exploration, exploitation and development of natural gas and crude properties located onshore and in state waters along the Gulf Coast. The acquired Goldking properties were located onshore the Louisiana and Texas Gulf Coast and consisted of interests in 23 fields and 136 producing wells. The vast majority of the Goldking fields – such as Garden Island Bay located in Plaquemines Parish, Louisiana – were former legacy assets of major energy companies. Combining Goldking's assets with Dune's existing asset base created a company with 142 Bcfe (billions of cubic feet equivalent) of proved reserves as of December 31, 2006, covering 28 fields along the Louisiana and Texas Gulf Coast.[26]

66. Dune promulgated the following message of the ways in which the "New" Dune would benefit from the Goldking Acquisition:

a. significant sustainable cash flow; most Goldking assets had extensive production history, which complimented Dune's existing Barnett Shale "gas manufacturing;"

[26] Press Release: *Dune Energy Closes Acquisition of Goldking Energy Corporation* dated May 16, 2007

b. High degree of operational control; pro forma operation of in excess of 90% of producing wells, with average working interest over 90%;

c. Sizeable deep pool and sub-salt exploration potential;

d. Multi-year drilling inventory.[27]

67. However, despite the optimistic prospects conveyed by Dune at the time of the Goldking Acquisition, the Debtors would struggle through the following years, culminating in Dune's bankruptcy filing on March 8, 2015 due to the D&O Defendants' negligence in inadequately performing diligence of the Goldking Acquisition as well as a multitude of other failures.

**(1) Dune Assumes Mystery Sheen Environmental Liabilities from the Goldking Acquisition**

68. Dune's acquisition of Goldking exposed the Debtors to enormous environmental liabilities related to Goldking's oil and gas leases in Garden Island Bay ("***GIB***") located in Plaquemines Parish, Louisiana. The area impacted by the Mystery Sheen was christened the "Area of Concern" or the "AOC."

69. The Mystery Sheen had been first discovered in September 2005 after Hurricane Katrina passed over GIB the month prior and was therefore known to numerous involved parties, including Dune's officers, at the time of the Goldking acquisition. In fact, a memorandum dated June 11, 2006 from Casey Jones of Goldking to Hal Bettis documents Goldking's attempts to pin the liability on Shell. However, these efforts were to no avail due to the US Coast Guard (USCG)

[27] Ibid.

and other agencies' assertion that "*they can only follow the OPA 90 regulations, which assign responsibility to the lessee*."[28]

70. The D&O Defendants failed to appropriately perform diligence into Goldking's environmental liabilities. Prior to the closing of the sale, Dune had the right, and the D&O Defendants had the duty, (i) to conduct title and environmental due diligence on Goldking's oil and gas fields located in South Louisiana and along the Texas Gulf Coast, including working and other interests in oil and gas leases, wells, and properties, together with rights under related operating, marketing, and service contracts and agreements, seismic exploration licenses and rights, and personal property, equipment, and facilities and (ii) to assert title defects and environmental defects if the value of each such defect exceeded $100,000 individually. The $302.5 million cash portion of the purchase price was to be reduced with respect to any uncured title defects and unremedied environmental defects to the extent that such aggregate values exceeded $5 million, and the deal may have been terminated if defects totaled more than $32.05 million.

71. Dune failed to perform in-depth environmental analysis and diligence and instead caused Dune to fully assume Goldking's Mystery Sheen and other environmental liabilities, including the plugging and abandonment liabilities for 200 unplugged wells, as discussed below:

> Question: "*…you mentioned a hundred wells that need to be plugged and* –"
>
> Watt Answer: "*200*."
>
> Question: "*200. How did – how did the debtors end up with so many wells that needing to be* --"

[28] Memorandum from Casey Jones to Hal Bettis dated June 11, 2006 Re: Garden Island Bay Mystery Sheen Status Report and Path Forward

Watt Answer: "*It was part of what we bought in 2007 when we bought the assets from Goldking.*"[29]

72. The Debtors relied on an environmental assessment of Goldking's assets performed by Engelken & Associates, L.P. which stated the following information regarding the Mystery Sheen:

"*In a meeting with Goldking, on April 27, 2007; E&A was advised that the United States Coast Guard (USCG) recently (April 2007) issued Shell a Notice of Designation naming them the party at fault for the mystery sheen… **Mr. Hal Bettis** provided E&A a copy of the documented study and explained the current status; stating the USCG had sent Shell Oil Company's pipeline subsidiary a Notice of Designation regarding the sheen and that a meeting during the first week in May would set the cleanup in motion.*"[30] (emphasis added).

73. The environmental report solely relied on the misrepresentations of Goldking's management – notably those of Hal Bettis who would directly benefit from the consummation of the Goldking Acquisition by becoming the Chief Operating Officer of Dune following its closing. Dune's management failed to directly communicate with the USCG and other governing authorities in obtaining information on the current status of the Mystery Sheen liabilities and instead negligently relied upon the misrepresentations of Goldking's management.

74. The Debtors hastened the Goldking Acquisition, and the transaction closed on May 15, 2015, two weeks ahead of its anticipated closing date of May 28, 2015.[31] More importantly,

---

[29] Watt Deposition p. 117

[30] *Environmental Assessment Update: Goldking Operating Company Assets* prepared for Dune Energy, Inc. by Engelken & Associates, L.P.

[31] Press Release: *Dune Energy Closes Acquisition of Goldking Energy Corporation* dated May 16, 2007

Dune failed to adjust the $302.5 million cash payment or to terminate the deal outright, as they should have done to reflect Goldking's environmental liabilities, as the Mystery Sheen liabilities are considerably greater than the $32.05 million threshold amount stated in the SPSA.

75. It was not until Dune filed its 2007 Form 10-K on March 4, 2008 that the Debtors reported it had "*inherited an environmental contingency*" from Goldking. Dune reassured its stakeholders that the contingency was likely the responsibility of a third party, later stated to be Shell and/or Texaco. Dune and its executive team would continue to argue this despite the reinforcement of USCG and other authorities' conclusion – that Goldking and thus Dune, after the closing of the Goldking Acquisition, are the responsible party for the Mystery Sheen liabilities. As discussed below, the Debtors' environmental liabilities would also be a central reason in deterring potential buyers from acquiring Dune, consequently causing serious, injurious effects to the company's performance and prospects for years thereafter.

**(2) Dune Overpaid for Goldking Due to Overstated Reserves and Projections**

76. Prior to the closing of the Goldking Acquisition, Dune filed a Form 8-K on April 30, 2007 with the SEC containing pro forma consolidated financial information which projected the anticipated results of the then prospective merger.[32] The projections contained therein were highly optimistic and entirely unreflective of actual performance. In reality, Dune's actual production in 2008, the full year immediately following the Goldking Acquisition, was significantly lower than was predicted – net oil and condensate production was 34% lower than projected while net sales gas production was 45% lower than projected. Revenue also exhibited a

[32] Form 8-K filed April 30, 2007

negative variance despite the added benefit of a spike in commodities prices – oil and condensate prices being 68% greater than projected while gas prices being 54% greater than projected.

77. Following 2008, annual revenues plummeted, ranging from $47 million to $65 million in the years prior to the Debtors' bankruptcy due to the company's inability to monetize its purported copious reserves. During this period, the Debtors' reserves were cited by Red Mountain Resources, Inc. as a reason for the termination of a potential transaction in June 2014: "*While we are excited about the Dune asset base, the reserve risk profile and environmental/P&A liability are too great for us to complete a deal…My group determined the risk profile of the reserves did not match the capital structure...*"[33]

**B. Directors and Officers Persistently Fail to Appropriately Address and Monetarily Quantify the Amount of Environmental Liabilities**

78. The D&O Defendants continuously attempted to defer responsibility of the Mystery Sheen environmental liabilities to other parties, even after the USCG issued *Administrative Order Number 001-09* on August 28, 2009 to formalize its conclusion that Dune was the responsible source of the Mystery Sheen and to impose upon Dune instructions for the cleanup of the contamination.[34] Dune alleged that Shell maintained a 10-inch pipeline through the AOC which had been decommissioned in 2000 due to subsidence and leaks and that for some period of time, Texaco maintained a disposal pit in this location.[35]

79. In conjunction with their evasion of responsibility, the Officer Defendants developed a "band-aid" approach to handling the Debtors' environmental liabilities to create an

[33] July 10, 2014 Email from Red Mountain Resources, Inc. to James Watt

[34] *Administrative Order Number 001-09* issued August 28, 2009 by U.S. Department of Homeland Security and United States Coast Guard

[35] Redlined document titled "Unified Command Discussion Sept 2011" addressed to Capitan Peter Gautier and members of the Unified Command

appearance that they were manageable and to diminish the gravity of the situation and costs. This is highly evident in Watt's response when asked if he believed the Mystery Sheen liabilities were material enough that it would reasonably distract or dissuade a potential investor:

> "*In my view, no, in that I've lived with it for ten years and I understand the state, I understand other things. In the view of someone coming into it and looking at it and – you can look at a couple situations where those have been in place in the Gulf Coast where the authorities have required that the cause of the spill be dug up. I mean, that can be jillions of dollars. So, to me, I – as I say, I've lived with this concern for ten years. I don't think it's going to take that. We have a plan in place. But people looking at it coming in cold are going to look at it with a much more stringent viewpoint or wanting to take significantly more value out of the equation to accommodate the unknown risk associated with it.*"[36]

80. However, the true cost of the environmental liabilities caused Dune to be insolvent, a fact that Hal Bettis alludes to in a December 29, 2009 email: "*Recently, Captain Stanton with the USCG Sector New Orleans…named Dune the responsible party (RP) requiring Dune to remediate by excavation…The cost to remediate by excavation is north of $10MM…a figure Dune cannot handle with our financial balance sheet.*"[37]

81. The "stringent viewpoint" Watt discusses related to how buyers would consider the Mystery Sheen is exactly the lens through which potential buyers assessed Dune, such that all potential acquirers ultimately passed on any transaction until bankruptcy. Furthermore, the "stringent viewpoint" is exactly what the D&O Defendants should have used in assessing Goldking before they agreed to purchase Goldking in a stock sale whereby Dune assumed the Mystery Sheen

[36] Watt Deposition p. 117.

[37] December 29, 2009 Email from Hal Bettis to John Pearce (Montgomery Barnett)

liabilities. The D&O Defendants breached their fiduciary duty and failed in their duty of care to properly analyze the enormous environmental liabilities at the time of the transaction as well as in the years following the consummation of the Goldking Acquisition until Dune ultimately filed bankruptcy.

82. Numerous sources indicate that the actual figure for the Mystery Sheen environmental liabilities may actually be upwards of $50 million. For example, in September 2011, Bettis explicitly stated this figure in an email to a member of the US Coast Guard ahead of a meeting saying, "*we hope you will appreciate the importance of the decision to wait and monitor the AOC as it is stabilizing monthly and not causing* ***need to spend $50mm*** *of anyone's monies.*"[38] (emphasis added).

83. The amounts reported on Dune's balance sheet and the amounts spent on remediation at the time and years following did not fully capture the magnitude of the environmental problems. Further illuminating about the magnitude of the liabilities are Watt's statements from his September 2011 memo to Captain Peter Gautier and members of the Unified Command:

> *"We have been designated as the responsible party regarding what has been referred to as the 'Mystery Oil Spill'…After being designated as the responsible party, we undertook a full investigation of methods to remediate the area…we, as a micro cap oil and gas company, cannot afford the liability that could occur if we attempted to remove their (Shell's) pipeline… I have heard…over the past few days…we must 'remove the threat' and that this is a 'ticking time bomb'…Dune has limited finances and operates almost totally off cash flow from its properties…I also ask you to look at the bigger picture*

[38] September 10, 2011 Email from Hal Bettis to Peter Gautier of US Coast Guard titled "RE: Meeting Request"

*of what a demand by the Unified Command for Dune…**to undertake a multi-million dollar reclamation project… could easily put Dune in bankruptcy**…Garden Island Bay field would then be designated by industry as totally untouchable. It could not be sold to another company."*[39] (emphasis added).

84. The Debtors' environmental liabilities ultimately rendered Dune insolvent; however, the Officers were committed to their strategy of "handling" the environmental liabilities, as shown in a January 2012 email exchange between Robert Schmitz and James Watt. When asked by Schmitz, "*With respect to the 'mystery sheen' are we likely to face other legacy liabilities in Garden Island…*" Watt stated, "*We have about $30 mm of abandonment liability, PV about $15 mm. If we play our cards properly, we can manage same.*"[40]

85. The Officer Defendants' band-aid approach was further exemplified in the Watt's overview of the situation to the Board: "*…the Unified Command (Coast Guard group)…have been demanding a complete excavation of this area [mystery sheen] as the only viable clean up…they designated us the responsible party…We are suggesting that we will undertake a capping of the site…will probably cost of the order of $2mm over the next year…it will settle a major environmental risk.*"[41]

86. While the actual costs remain unknown due to the directors' and officers' failure to quantify them, it is indisputable that they were considerable enough to challenge the Debtors' solvency and that they were solely the Debtors' responsibility. Moreover management's band-aid

[39] Redlined document titled "Unified Command Discussion Sept 2011" addressed to Capitan Peter Gautier and members of the Unified Command

[40] January 20, 2012 Emails Between Robert Schmitz and James Watt

[41] January 20, 2012 Email from James Watt to Dune Board

approach was entirely inadequate in dealing with the environmental issues to the government's standards, despite management's desperate attempts to contain them.

87. That the Director Defendants were aware of these facts is further evident in a memo discovered on James Watt's computer from approximately the same 2011 time frame, in which Watt wrote:

> "*In regard to the Mystery Sheen, we have further disclosed that the Coast Guard has determined that Dune is the responsible party regarding this area. Due to the complex nature of the source of the sheen, we have stated it is impossible to make a determination of costs associated with remediation of the area…the Coast Guard has the authority to find Dune the responsible party as they have done…Putting a specific dollar number associated with a remediation effort that is totally inappropriate to implement would not be in the best interest of any parties…Trying to specify a value for methods of remediation that have been rejected as inadvisable by all parties involved is not an appropriate action and putting such a number in the public domain could be detrimental to our ongoing efforts…**Please ensure any communication regarding this issue, especially as it relates to potential future costs and Dune's legal position regarding same are fully protected under attorney/client privilege**.*"[42] (emphasis added).

88. It is clear that the Officer Defendants are attempting to keep this vital information from Dune's other stakeholders – especially telling, as this was in the midst of discussions to obtain additional debt financing, resulting in Dune's successful refinancing in December 2011.

[42] Undated memo titled "Environmental Due Diligence on Mystery Oil Sheen at Garden Island Bay," last modified by Watt on November 2, 2011.

89. Furthermore, the Director Defendants were also negligent in the performance of their duties, in that they failed to understand the extent of Debtors' environmental liabilities. In January 2012, Board member Dr. Alexander A. Kulpecz, Jr. sent Watt the following inquiry regarding the Mystery Sheen liabilities: "*I think we'll need to see a full analysis from your staff on this one [mystery sheen]; how much is leaking, what exactly is your procedure, what if the sheen returns, cost of other options (if any), etc. I'll request the chair to include this in our next meeting.*"[43] However, it seems that the directors neglected to follow up, and the requested analysis was never shared with the Board. The Board minutes at the February 2012 meeting reflect no such discussion.

90. The Director Defendants did not concern themselves with attempting to properly assess the Mystery Sheen liabilities, and continuously operated based upon incomplete information due to their own negligence. The D&O Defendants' failures to properly address and quantify the environmental liabilities had profound repercussions for the Debtors, as at least three potential transactions with EPL, Red Mountain Resources, Inc., and EnerQuest failed to be consummated due to the other parties' refusal to assume Dune's enormous environmental liabilities, which further underscores the D&O Defendants' failure to properly perform diligence on Goldking's environmental liabilities at the time of the acquisition.

a. EPL

91. The potential transaction with EPL is discussed further in this Petition for many reasons related to the D&O Defendants' failures; however, notably, EPL retracted its offer to acquire Dune due to its EPL's hesitations about Dune's environmental liabilities, as Watt explained: "*EPL had been looking at us for a significant amount of time and they opted that they*

[43] January 22, 2012 Email from Dr. Alexander A. Kulpecz, Jr. to James Watt titled "FW: Friday Update"

*did not want to take on the environmental liabilities…there were some 200 wells that still needed to be plugged and abandoned within the field…*"[44]

b. Red Mountain Resources, Inc.

92. Red Mountain stated the following to James Watt, regarding a potential transaction with Dune Energy, "*While we are excited about the Dune asset base, the reserve risk profile and environmental/P&A liability are too great for us to complete a deal.*"[45]

93. Further statements from Watt elucidate Red Mountain's unwillingness to entertain a transaction due to Dune's environmental liabilities: "*Red Mountain…we had them come and do a couple days of due diligence…and sometime not long after that they felt the – the environmental liabilities associated with the properties were more than they were willing to take on, therefore, they dropped out of consideration…the abandonment and what's call the mystery sheen and basically all of the environmental liabilities associated with the company.*"[46] Rather than being willing to revise its offer to deal with Dune's environmental liabilities, Red Mountain "*just said was [it] not what they wanted to get into.*"[47]

c. EnerQuest

94. EnerQuest was unwilling to acquire Dune's properties within the Area of Concern, as Watt stated when he was asked about Dune's discussions with EnerQuest in November and December 2014: "*Somewhere in this time window, he [Greg Olson of EnerQuest] had a lengthy conversation with some of our guys around Garden Island Bay and its – its potential liabilities*

[44] Watt Deposition p. 33

[45] July 10, 2014: Email from Red Mountain Resources, Inc. to James Watt

[46] Watt Deposition p. 116

[47] Watt Deposition p. 117

*and he called me and said, 'I'm not interested in Garden Island Bay is part of the – part of the transaction.*"[48]

95. As presented above, the D&O Defendants' failure to quantify the actual amount of the environmental liabilities and to fully address them to the satisfaction of the USCG and other governing authorities caused serious harm to the Debtors and their creditors. The Officer Defendants' futile efforts to "manage" the liabilities using a band-aid approach and the Director Defendants' negligence regarding same caused them to make poor, ill-informed judgments about the Debtors' options in their assessment of numerous acquisition offers and other strategic and financing decisions.

96. Furthermore, the environmental liabilities caused the Debtors to be insolvent, long before Dune was actually forced to file for bankruptcy. Thus, the Director Defendants had a duty to represent the interests of Dune's vendors and other creditors in making prudent governing decisions rather than recklessly gambling with Dune in the pursuit of high returns to equity. The fragmentation of the Board and the varying special interests of the Directors are further discussed below.

### C. Directors Lack Independence and Are Collectively Dysfunctional due to their Conflicts

97. At various times, the Directors were appointees of or had ties to Dune's second lien lenders who also formed the company's equity holders. In a February 5, 2013 email, Watt succinctly characterized the lack of independence of the directors as follows:

> *"Although all directors are by definition independent, the directors have ties to as follows to the equity holders. SVP named Bob Schmitz as chairman. He maintains close*

[48] Watt Deposition p. 168

*communication with SVP. SVP does plan to name an independent replacement for Steven Kovacs. Mike Keener and Alex Kulpecz have informal ties to TPG. Eric Steans has a very loose tie to WestFace. None of the other holders named directors. We are currently seeking a truly independent new director."*[49]

98. In April 2013, Dune announced that it had hired two directors: Marjorie Bowen and John Brecker. The latter Director had been nominated for consideration by Strategic Value Partners LLC ("***SVP***"): *"Attached is John's resume, per our discussion. I am sure that you will find him [John Brecker] to be a strong addition to the Board."*[50] Watt then forwarded the subject attachment to a group in an email with the subject title "SVP Candidate." SVP was the investment firm which managed Strategic Value Special Situation Fund, L.P., the largest shareholder of Dune as of the Petition Date.[51]

99. In January 2013, James Watt frankly discussed his trepidations regarding the composition of the Board :

*"…I also would like to discuss the 'new committee'. It is my feeling that a committee that consists of a majority of the board members is really not a committee, but a disenfranchisement of the non-participating members. I think we also need to look at whether we should put in place stock ownership requirements for the executive and board members…If we are hoping to list on a major exchange in the next year, it will be a red flag that none of our non-management board members owns any stock…We need the minutes finalized of all the prior board meetings including the resolution of the stock sale.*

[49] February 5, 2013 Email from James Watt to Tom Hensley (Parkman Whaling) titled "FW: EQUITY & DEBT BALANCES OF 8 SHAREHOLDERS."

[50] February 8, 2013 Email exchanges between Curtis Solsvig (Strategic Value Partners) and James Watt

[51] Dkt. 14 – Declaration para. 16

*I would like to get those in place as soon as possible as the auditors will demand same and accounting cannot pay for board meetings without minutes. The board wanted their fees for last quarter yesterday…we did our deal on the fly last year, and although we made it through, there were several lumps that could have been avoided and made both of our lives a bit easier…"*[52]

100. The make-up of the Board and the Directors Defendants' baggage created chaos in the operation of the Board and negatively influenced Dune management as well, as the directors were prone to switching between their second lien hat and equity hat, depending on which position benefited them more given the circumstances. Watt commented on the predicament, "*the noteholders and the shareholders are essentially the – the same group, although in different – in different interests. So, hard to say when I had a phone call, say, with Blue Mountain or something, was I talking to a noteholder or a shareholder…"*[53]

101. There are numerous instances in which the dysfunctions of the Board resulted in the D&O Defendants' poor decision making, inability to address Dune's issues, conflicts of interest, and other improper actions that caused harm to Dune and its creditors. The following excerpt from Watt's April 2013 email exchanges with Marjorie Bowen highlights the vastly differing interests and intentions of the Board members and the parties they represented:

"*…Yes, we clearly have board members who are serving as proxies for various constituents, which doesn't surprise me…Re our shareholders positions, here's my simple view on each constituent – and remember, I said simple: 1) hopefully with John on board and Curt going to SVP, SVP will be more interested in maximizing strategies as opposed*

[52] January 3, 2013 Email from James Watt to Paul Hurdlow (DLA Piper) titled "2013 Plans"

[53] Watt Deposition

*to pushing for a sale at the wrong time in our life cycle. 2) TPG wants to spend other peoples money (borrowed of course) but if they really support drilling then they should give us an appropriate amount of equity to go fund what we need to fund – i.e. convert their notes to equity so that we could take better advantage of leverage!), 3) same argument for Blue Mountain. 4) WestFace, et al, perhaps acquisition works, it all depends upon price, and the only way to test their willingness is to tee one up and see…Hopefully the board can be constructive…It will be a process no doubt…It could be that we benefit from bringing in a 'trusted advisor' to help us convince ourselves (aka our shareholders) that a given route makes the most sense…perhaps a firm that knows our business sufficiently to provide an 'independent' view…but also someone who actually has relationships with our shareholders…"*[54]

102. Watt further described the problem in the same email thread titled "Dune:"

*"…Unfortunately a number of our major shareholders are pushing certain board members to be an advocate for their position only. SVP has been convinced that the stock is worth far more than it has ever traded for and refuses to accept reality and thus continues to push sale of the company into a market that does not want to be a buyer. I find it an amazing position. TPG is convinced we can drill out way out of this problem and the impediment is that BMO will not give us full access to our revolver due to the covenants. We have talked with several other banks and their covenants are similar and thier [sic.] borrowing base is dramatically lower. Blue Mountain also thinks we should be far more aggressive at drilling and assume we will be able to bully our way through the covenants. WestFace and Equity Capital and potentially Whitebox feel the only solution is to acquire*

[54] April 3, 2013 Email response to James Watt titled "Dune" from Marjorie Bowen

*other assets and grow the same way that EPL has done. None of these guys are bashful, but they are also very reluctant to break ranks as they are involved in several other deals with this same group. It makes for an interesting challenge. I really hope we can get this opportunity in front of the shareholder group and is [sic.] does not bog down in the board so we can show them a real opportunity and get a cleared direction of how they prefer we move forward. In my view three or four months of investment banker studies followed by a presentation of alternatives to our shareholders will not solve any problems for any of us."*[55]

103. The following day Frank Smith (CFO Dune) responded:

*"…Management no longer has strategic voice and even less credibility with the investors and has by now made it clear to certain board members. Keener and Bob are now in charge of the grand plan…Most of these investors have probably now made it clear to key board members that the restructuring was based on the drilling inventory and not an M&A solution…they see it as a personal risk to depart from the organic growth path without third-party guidance. They (Bob and Mike at least) do not trust this to you.* ***This course is doomed to fail*** *but it is the safe route for them. It sets you up to take the fall when the drill bit solution doesn't yield the value that we said was there in 2011."*[56] (emphasis added).

104. The dysfunctionality of the Board also led to incredible friction between the Director Defendants and the Officer Defendants with the Director Defendants going rogue and overstepping the boundaries of acceptable actions as well as overall poor communication between

[55] April 3, 2013 Email from James Watt to Marjorie Bowen titled "Dune"

[56] April 4, 2013 Email from Frank Smith to James Watt titled "Dune"

the two groups. James Watt described the terrible environment caused by the Director Defendants' improper behavior, and the effect it had on both parties' ability to perform their duties.

> "*On the near term, I plan to put together the bonus program as mentioned at the end of the year. On longer term retention, the best retention tool would be for the board to let the company management do the job they were hired to do. We don't need to be told how much to borrow and how to manage our working capital, we don't need to be told how to badger our commercial bankers, we don't need board members calling our commercial bankers telling them what to do, and we don't need to have a law firm that spends more time hand holding our chairman and coddling one "insurgent" board member than accomplishing the objectives of our management team. These issues have created a very unhealthy environment with the senior management group. The new committee, especially now with Bob as a member is going to create added uncertainty for the employees.*"[57]

105. The Officer Defendants failed to provide sufficient information to the Board – especially regarding the extent of the Debtors' environmental liabilities. The lack of communication between the two groups was known as an issue by all D&O Defendants:

> Question: "*The last sentence in this page says "A further mandate has been given the Dune management to improve its communication with the board and shareholders"…Had the large shareholders complained about – about communication with the management?*"
>
> Watt Answer: "*I would say, yes.*"[58]

---

[57] January 2, 2013 Email from James Watt to Eric Stearns titled "Re: Comp"

[58] Watt Deposition p. 27

106. There is an incredible amount of evidence which highlights these ongoing issues and the impact they had on the D&O Defendants' performance. In a particular exhibition of the impropriety of the Board's actions, the non-executive chairman of the board after 2011, Robert A. Schmitz, appears to have undertaken executive power without full Board authority. All his actions appear to be ultra vires, making him personally liable for any damages his actions caused. The precise scope of his liability will necessarily wait until discovery unfolds.

107. In a memo believed to be from James Watt to Marjorie Bowen, Alex Kulpecz, and Eric Stearns (believed to be Board Compensation Committee) titled "Compensation Matters – Confidential" Watts described the runaway board chair as follows, while also describing the stonewall breaches of duty by the board:

> *"The compensation committee has asked me, based on shareholder input, to waive the remainder of the retention bonus and put that amount at risk under the normal performance metrics set out in the beginning of the year.*
>
> *You asked me to outline for you under what terms I would agree to waive the retention bonus and put it at risk…*
>
> *Condition 1: Name me as board chairman immediately…*
>
> *Condition 2: Enforce our existing governance documents. Under the governance documents, agreed to by the shareholders at the debt to equity conversion, the CEO is to be in charge of the company affairs and make capital commitments, contract commitments and vendor commitments within the scope of the authorization put in place by the board. Further the CEO is to be the designated communicator for the company to shareholders, vendors and contractors. Additionally, committees of the board, report to the full board and not just the chairman. The chairman, according to the bylaws, is to chair the annual*

*meeting and perform other duties as defined by the board. Our chairman is acting as if he is an executive chairman and requiring the CEO and board committees to report to him individually. He is speaking out to shareholders without advising the management team. He is attempting to control our investment bankers. He is try to control all decisions of management. I will waive the retention bonus when I can be assured that we will follow the governance documents that I negotiated with all our shareholders in the debt for equity exchange. This issue has been discussed at length over the last 18 months, and the 'assurance' must be documented and immediately enforceable.*

*The board recognizes that the only real way our shareholders can get liquidity and 'fair' value for their shares is through a M&A transaction. The majority of our shareholders also recognize that this is the best path forward. Our two investment bankers agree this is the best path forward. The only way we are going to deliver value to our shareholders is to implement a M&A transaction. We cannot accomplish such a transaction unless the company speaks with one voice. Either condition 1 or 2 will allow us to speak with one voice. Continuing our current two headed approach to transactions will result in complete failure. I look forward to your input.*"[59]

108. Moreover, the Debtors' inability to consummate a value-enhancing transaction or to properly monetize their alleged vast reserves coupled with their negligence in addressing the Mystery Sheen and other environmental liabilities were symptomatic of the D&O Defendants dysfunctionality, lack of independence, and conflicts of interest, as well as their overall extraordinary negligence and breach of duty.

---

[59] October 12, 2013 Memo believed to be from James Watt to Marjorie Bowen, Alex Kulpecz, and Eric Stearns titled "Compensation Matters – Confidential"

109. In further reflection of their dysfunctions, the D&O Defendants were prone to falling behind on filing Board meeting minutes, which serve as a crucial instrument to record evidence that a company's directors are acting and deliberating soundly in their governance of an entity. From an email to DLA Piper sent by James Watt on January 3, 2013: "*We need the minutes finalized of all the prior board meetings including the resolution for the stock sale. I would like to get those in place as soon as possible as the auditors will demand same and accounting cannot pay for board meetings without minutes. The board wanted their fees for last quarter yesterday.*"[60]

### D. Board Fails to Consummate Viable Acquisition Offer from EPL and Instruct Management Not to Entertain Other Plausible Deals

110. In early 2012, EPL expressed interest in potentially acquiring the stock of Dune at $4.00 to $4.50 per share. Although diligence had not been performed by EPL on Dune at the time of the offer, on February 16, 2012, the Board instructed Dune to flatly reject the offer and any similar expressions of interest that may come from other parties. An excerpt of the February 16, 2012 Board Meeting Minutes reads:

> "*Mr. Watt announced that he had been approached by a management representative of a publicly-traded oil and gas company with respect to acquiring Dune for stock. The representative suggested that the potential price offer might fall into the $4.00 to $4.50 per share range. The Board instructed Mr. Watt to convey to the representative that it was not interested in considering an offer at this time as those levels.*
>
> *The Board then indicated that Mr. Watt should generally be prepared to provide a similar response to comparable expression for the immediate future.*"[61]

[60] January 3, 2013 Email from James Watt to Paul Hurdlow (DLA Piper) titled "2013 Plans"

[61] *Minutes of the Meeting of the Board of Directors of Dune Energy, Inc. Held on February 16, 2012*

111. On the date of the February 16, 2012 Board meeting, Dune's stock was trading at $3.40 per share.[62] Thereafter, Dune's stock failed climbed above $3.75 (which it only hit in the following two weeks) and then suffered a somewhat steady and consistent decline from that point forward through the Debtors' bankruptcy filing date.

112. The acquisition expression of interest, which as portrayed to the Board as potentially falling between $4.00 and $4.50 per share, was well in excess of the market price of Dune at the time, which was $3.40 per share, and represented a premium of 18% to 32% over the then-current Dune stock price, clearly adding value to Dune stakeholders. The Board failed in its duties by instructing Watt to inform the party it was "not interested."

113. EPL's offer to acquire Dune should have been actively considered, pursued and consummated instead of patently dismissed by the Board. EPL is an independent oil and natural gas exploration and production company based in New Orleans, Louisiana, and Houston, Texas, which was publicly traded under the ticker symbol "EPL" on the New York Stock Exchange. EPL's operations were concentrated in the U.S. Gulf of Mexico shelf, focusing on the state and federal waters offshore Louisiana. EPL was a well-capitalized, strategic acquirer that had the ability to close a transaction with Dune.

114. Even more egregious is the Board's direction to flatly reject similar expressions of interest for the immediate future without appropriate consideration. The Board's instruction to Watt was clear: "*provide a similar response [Dune was not interested] to comparable expressions for the immediate future*."

115. Dune was having financial and liquidity issues at the time; and should have pursued the deal with EPL. Per the February 16, 2012 Minutes, the Board "*withheld approval of the*

[62] S&P Capital IQ.

*projects in the second half of the year pending the results of early drilling and resultant liquidity forecasts,*"[63] making apparent upcoming liquidity a great concern.

116. Regarding an upcoming interest payment, the Board opted to accrue interest as paid-in-kind rather than disbursing cash interest payments due to concerns of liquidity. From the Feb 16, 2012 Minutes: "*the Board discussed the merits of marking a PIK versus 100% cash interest payment on the $50 million take back note as a way of preserving short-term liquidity to dedicate to the projects presented. The Board agreed that the interest payment due on March 15, 2012 should be a 3% cash pay and the remainder in a PIK.*"

117. Furthermore, at the same February 16, 2012 Board meeting, "*the Board asked that Messrs. Watt and Smith provide the Board with guidance on the cash and liquidity targets of the Company on or before the next Board Meeting*" again indicating that cash and liquidity were of great concern to the company.

118. Based on the condition and prospects of the Debtors at this time, the Director Defendants' absolute instruction to Watt to reject acquisition offers was a failure to consider the best strategic options of Dune and a clear breach of duty.

119. The day following the February 16, 2012 Board meeting, James Watt informed Henry Havre (Andrews Kurth) and Frank Smith of EPL's proposition and his conveyance of same to the Board:

> "*Last week, EPL stopped by and indicated they would like to open discussions regarding a potential merger in the $4.00to [sic.] $4.50 range for Dune. I discussed this offer with our board and they feel strongly that at those levels it is significantly undervaluing the company. I passed this comment back to EPL this morning. I have heard*

[63] *Minutes of the Meeting of the Board of Directors of Dune Energy, Inc. Held on February 16, 2012*

*rumors that they are preparing to try to but a letter in place to try to force our board into further actions*."[64]

120. Despite the Board's initial instruction to decline the offer, dialogue between Dune and EPL continued, as evidenced by a February 23, 2012 email from James Watt to Richard Mourglia and Jim Gagliardi: "*Mac Jensen called to indicate they [EPL] wanted to review our program in more detail and are willing to sign a CA. Let's discuss the particulars of the CA before you send it forward. I want to make sure they cannot buy stock etc., in the agreement*."[65]

121. On March 13, 2012, Watt informed Bob Schmitz and Frank Smith (CFO of Dune) of discussions he had shared with EPL representative, Mac Jensen, in which EPL had rescinded its offer, although they remained open to discussions to determine "*what value they could put on the company*."

122. In April 2012, EPL representatives spent some time in Dune's offices reviewing the company's data. EPL's diligence into Dune stalled by late spring, however, as evidenced by James Watt's inquiry to Mac Jensen of EPL, which itself was in the midst of closing another transaction: "*Saw your announcement on W and T assets today. Congrats. Is Dune in your plans?...Please advise*."[66]

123. After what appears to be back and forth discussions between the parties, the deal ultimately did not progress due to EPL's unwillingness to assume the Mystery Sheen liabilities as well as its inability to meet Dune's demands in terms of amount and form of consideration for

---

[64] February 17, 2012 Email from James Watt to Henry Havre (Andrews Kurth) and Frank Smith titled "Potential Offer"

[65] February 23, 2012 Email from James Watt to Richard Mourglia and Jim Gagliardi titled "EPL"

[66] May 16, 2012 Email from James Watt to Mac Jensen (EPL) titled "Dune"

Dune's stock. Dune's position appears to be that cash—which EPL was offering—did not offer the upside Dune was seeking.

124. Correspondence from March 13, 2012 between Watt and Robert Schmitz demonstrated the D&O Defendants' negligent delusions regarding the value of Dune.

> *"Talked with Mac Jensen (EPL) again yesterday and told him again that our board had no interest in recommending a sale in the range he discussed and I was not going to put the company in play based on that expressed level of interest…I told him without an expression of interest at a much higher level, I would not recommend further discussions. I further told him that we were making available a review of the major upside potential of the company. The defined value of this upside on an un-risked basis is over $600 million. If they put a 10% value on that upside, it could add $1.50 per share to an offer price at an 20% risk value it could add $3.00 per share…"*[67]

125. The D&O Defendants negligence in understanding the Debtors' environmental liabilities coupled with their far too optimistic prospects about Dune's reserves caused them to significantly overvalue the company, which ultimately led them to make improper decisions regarding important decisions of the company to the detriment of Dune and its creditors.

**E. Management Pursues Self-interested Transactions with Eos and Shoreline**

126. In mid-2014, the Debtors pursued a sale to Eos Petro, Inc. for self-interested reasons despite the poor financial health of Eos and the firm's inability to consummate the transaction. Based on a review of public financials for Eos Petro Inc. (OTCMKTS: EOPT), over the past four (4) years (2012 through 2015), Eos was operating at a loss, never generated more than $800,000 in annual revenue, never had more than negligible cash or $1.5 million in total assets, and never

[67] March 31, 2012 Email from James Watt to Robert Schmitz titled "EPL"

produced any positive cash flow other than from financing, which came in the form of borrowing up to $3 million per year in debt to cover its losses.

127. Eos's poor financial health was known to Dune management – as shown in email exchanges during this same time frame, James Watt and Frank Smith expressed their skepticism in Eos's ability to complete the transaction, with Smith stating: "*Finally had a chance to scan the 1Q2014 10Q. It is a real eye opener. Lots of questions need to be asked. I don't know how he can afford us at the moment. It also appears he could have his own home involved in a foreclosure situation by the end of this month. Should be very interesting weaving through this EOS maze…*"[68] To which Watt responded, *"I didn't promise a clean deal did I? He is putting $5 mm in to keep things going*," causing Smith to flippantly reply, *"That is an understatement!! ☺ However, I really enjoy puzzles and mazes…"*

128. Additionally, Watt acknowledged Eos's insolvency at the time in the Watt Deposition:

> Question Posed: [Regarding Eos Petro] "*total assets 2013 of 1.3 million…and then total liabilities of 5.5 million…and a deficient of 4.1 million approximately, right?...Eos was actually insolvent, correct?*"
>
> Answer: "*Correct.*"[69]

129. Eos Petro, Inc. clearly lacked the financial wherewithal to close a transaction, a fact that the Officer Defendants were well aware of at the time. Watt asserted the same: "*You have to recognize that this is a company [Eos] that does not – is not coming to the table with a checkbook in hand to represent what they're offering.*"[70]

---

[68] May 20, 2014 Email exchanges between James Watt and Frank Smith titled "EOS"

[69] Watt Deposition p. 129

[70] Watt Deposition p. 130

130. Also from the Watt Deposition was further admittance of the Officer Defendants' awareness of Eos's inability to complete deals.

Question: "*Do you know why the Shoreline – their [Eos'] potential acquisition from Shoreline did not go through?*"

Watt Answer: "*No.*"

Question: "*Were you aware that in 2013, Eos has entered into a – an agreement with Buccaneer [Energy]?*"

Watt Answer: "*Yes*."

Question: "*And that that had fallen – that that had fallen through?...And you were aware of that at this – at this time.*"

Watt Answer: "*Yes*."[71]

131. As further evidence that the Officer Defendants were duly aware of Eos' inability to consummate a transaction with Eos, in a May 19, 2014 email exchanged between Nikolas Konstant of Eos and Sara Akbar (CEO of Kuwait Energy Group ("KEG")) regarding a potential transaction in which Eos purchased KEG, Akbar responded, "*…we don't feel comfortable moving forward based on its content. The fact that GHS [Global Hunter Securities] explicitly state that this letter doesn't represent a commitment on their parts to provide the necessary funds doesn't satisfy our query regarding the evidence of funds stated in our e-mail sent on the 4th of May 2014…"*[72] Nikolas Konstant immediately forwarded this information to James Watt even though as the CEO of Dune he should not have been party to this transaction. This information was shared with Watt, because, as will be discussed below, in May 2014, Watt was in the midst of setting up

[71] Watt Deposition p. 131

[72] May 19, 2014 Email from Sara Akbar (KEG) to Nikolas Konstant (Eos) then forwarded to James Watt by Nikolas Konstant.

a side deal whereby he and certain other Officers would abandon Dune in favor of accepting similar managerial positions at Eos.

132. In light of the vast risks associated with Eos, the Board required that Watt obtain some assurance and guarantee regarding the Eos transaction:

> Question: *"… 'The board expressed its overall support for the transaction,' the Eos transaction, 'but had concerned [sic] about…related to the lack of committed financing for Eos to complete the transaction and, therefore, requested that Mr. Watt attempt to negotiate a deposit, a pledge of the Eos parent company shares or a personal guarantee from an Eos principal'; is that correct?"*
>
> Watt Answer: *"Yes…We ended up being able to get the – the breakup fee in but not able to get a personal guarantee or anything else."*[73]

133. Although the offer from Eos did not have a financing contingency, there was no actual recourse for Dune if Eos failed to close the transaction. Despite the illusion of a reverse termination fee of $5.5 million, which was designed to be Dune's sole remedy for Eos's failure to obtain financing, in reality, Eos actually had no means to pay such a fee, as discussed in the following excerpts from the Watt Deposition:

> Question: "*…it says...'No financing contingencies, but the company's sole remedy for parent's [Eos'] failure to obtain financing is payments – parent's [Eos'] payment of reverse termination fee,' correct?*"
>
> Watt Answer: "*Correct*."

[73] Watt Deposition p. 155

Question: "*Based on the financials we looked at, there was no way that Eos could pay that breakup fee, correct, depending –*"

Watt Answer: "*With where they were at the time without raising some capital*."

Question: "*They would have to raise capital just to pay [the $5.5 million reverse termination fee] –*"

Watt Answer: "*Correct*."[74]

134. The Officer Defendants pursued the transaction with Eos due to their own self-serving goals with the understanding that they would be retained as management. In a May 17, 2014 email from this same period, Frank Smith and James Watt revealed their preoccupation with their own corporate positions with Smith asking, *"…where do we fit into the following hierarchy?"*[75] in reference to the Eos Petro / Plethora Energy Executive Management Team that includes Martin B. Oring as CEO of Eos and Gregory S. Montgomery as CFO of Plethora Energy, which appears to be a U.S. subsidiary of Eos.[76]

135. In the following days, Watt inquired to Nikolas Konstant of Eos about the future of Eos's then-current CEO: *"How would the existing board including Martin Oring fit into the potential structure?"* In response, Konstant stated, *"Martin Oring is only a stand in temporary CEO, he will resign immediately."*[77]

136. Watt discussed the understanding that the Officer Defendants shared with Eos in his deposition:

[74] Watt Deposition p. 148

[75] May 18, 2014 Email from Frank Smith and James Watt titled "Eos Petro"

[76] http://www.eos-petro.com/index.php?lang=&page=structure – accessed February 6, 2017.

[77] May 19-20, 2014 Email exchange between Nikolas Konstant (Eos) and James Watt

Question: [Regarding a July 9, 2014 letter from Eos Petro that says that buyer] *"shall…continue to employ the existing Dune management team and staff on the same or substantially same terms or such other terms to which the parties may mutually agree…"*

Watt Answer: *"Correct…his vision for…Eos, his desire for…a management team and assets and I assured him that we brought both to that table and that it would be, in my view, a – a good move for what he was trying to do to acquire Dune, be able to put some capital in it to get it so it was cash flowing in a positive basis, and then also have a – a team that had extensive knowledge and background in all of the areas he was looking to want to – want to go into."*[78]

137. In addition to the Eos deal, the Directors also expended considerable time engaged in discussions with Shoreline for the purposes of retaining their managerial positions in the new firm. As Watt discussed his self-interested reasons in the Watt Deposition: *"Throughout the Shoreline/Dune conversations, the assumption was that on a go-forward basis, I would have been the CEO of the company and, in that it was remaining a public company, our CFO would remain CFO and existing Shoreline management would fit in with – with our organization."*

### F. Management Negotiate Personal Side Deal with Eos in Show of Blatant Disregard for Dune's Other Stakeholders

138. The Officer Directors engaged in their own side deal with Eos Petro, outside of the scope of their duties at Dune to plan for their abandonment of the Debtors and for their transition to Eos Petro. These self-interested plans are very clearly outlined in a May 2014 document titled

[78] Watt Deposition p. 123

"EOS PETRO, INC Corporate Development Plan May 2014," found as a red-lined attachment to a May 16, 2014 email from Steve Craig to James Watt titled "EOS PETRO.docx." The document included the following damning provisions:

> "*We propose adding a Houston based corporate team. Initially this team would consist of James Watt as President and CEO, Frank Smith as CFO, Steve Craig as Sr. VP of Investor Relations / Administration and an administrative assistant…This team would be charged with developing the infrastructure for a NYSE listing of EOS Petro*."
>
> "*Compensation should include…a target bonus for the CEO of 100% of base salary, 75% for the CFO, 60% for remaining offers…Depending on performance each individual can receive between 1 and 2 times the target bonus amount on an annual basis. A stock based compensation plan…typically, 4-6% of the outstanding shares…distributed over a 3 year period. Normally, the CEO receives 3 to 4 times his annual salary in value of shares on an annual basis, the CFO received 2-3 times…a global [severance] plan…provide for 3 times salary and target bonus for the CEO, 2-3 times for the CFO, and 2 times for other [officers]…We have put all these plans in place at Dune and two prior companies.*"

139. More revealing was the excerpt under the heading "Timing" of the "EOS PETRO, INC Corporate Development Plan May 2014" which stated:

> "*Hopefully, I have Dune on a sale process that will conclude in the third quarter…If I stayed through final disposition I would receive a significant severance payment, however, I have no desire to sit around for several months just for that payment. As long as my new employment would provide a similar severance plan, I would be comfortable to*

*leave Dune in a very short timeframe. I believe the same would be true for the individuals I mentioned above…*"

140. It is clear that the Officers were engaged in their own side deal with Eos Petro, reneging on their loyalties and duties to Dune and planning to abandon the flailing the company (that they had themselves led to financial ruin) less than a year before Dune would eventually file for bankruptcy.

**G. Management's Pursuit of Self-Interested Transactions Result in Failure to Consummate Viable Acquisition Offers from Other Parties**

141. While the Officer Defendants were pursuing their self-interested deal with Eos, they declined to move forward with several other prospects that included a July 2014 offer from White Marlin for $70 million,[79] which was $51 million more than the $19 million[80] that Dune's assets ultimately sold for via 363 Sales during the bankruptcy cases.

Question: "*…letter…from White Marlin Oil and Gas Company dated July 11th, 2014, and it's another letter of intent, correct?...And this one contemplated a purchase of all assets for $70 million in cash?...what was the debtor's reaction to this proposal*?"

Watt Answer: "*…at the time…we were looking at transactions in the – in the low hundreds that were over and above our BMO debt, over and above the noteholder debt, and some consideration for the equity. A 70-million-dollar offer would have required that – that the noteholders – it was not sufficient to cover the – the debt of the company without a – some kind of restructuring*

[79] White Marlin Offer Letter dated July 11, 2014 sent to Stephen E. Conner of Perella Weinberg Partners. The letter was attached to an email sent from Mr. Conner to James Watt on July 11, 2014.

[80] Docket #379 – Order (A) Approving Purchase Agreement (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, Interests, and (C) Granting Related Relief [White Marlin Oil and Gas Company LLC] page 6 para M

> *effort. So, with other things we had going on, we – we did not continue discussions on this."* [81]

142. Additionally, in July 2014, Whitney Oil and Gas, LLC made a $30 million offer[82] for Dune's Garden Island Bay and Bateman fields, which ultimately sold to Whitney's affiliate, Trimont Energy (NOW), LLC, for a single dollar[83] via a 363 Sale during the bankruptcy cases, representing $30 million more than ultimately received by Dune stakeholders.

143. The D&O Defendants also failed to pursue a transaction with Linc Energy at approximately this same time:

> Question: "*Linc Energy and Red Mountain Resources…had offers that would – that would give value to equity; is that right?*"
>
> Watt Answer: "*Correct*"
>
> Question: "*And, so, why weren't Linc Energy and Red [Mountain] Resources being considered at this time?*"
>
> Watt Answer: "*…Red Mountain pulled out due to environmental and Linc was [having] a difficulty evaluating their currency that they were – that they were providing and they were not willing to budget on that…on the Linc offer…it's a purchase of Dune's outstanding stock; institutional shareholders to receive Linc shares and remaining stockholders to receive cash…*"[84]

[81] Watt Deposition p. 121

[82] DUNE00010362 – "Overview of M&A Proposals Received" prepared by Perella Weinberg Partners as well as July 1, 2014 email from Frank Smith to James Watt titled "RE: Whitney offer."

[83] Docket #378 – Order (A) Approving Purchase Agreement (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, Interests, and (C) Granting Related Relief [Trimont Energy (NOW), LLC]

[84] Watt Deposition p. 146

144. Furthermore, in addition to the various offers from strategic buyers, Dune received an offer in 2014 from a financial buyer, Morgan Stanley's private equity group. However, the Officer Defendants failed to engage further in this offer because they required a capital investment from Dune's management – a method of ensuring that the Officer Defendants were in line with the value-enhancing goals of the investors.

> "*The issue with – with Morgan Stanley – they clearly had the money, they were in the right – they were in the right ballpark. They are a private equity investor group…when they hire a management team, they wanted a – a capital investment from the management team…to put our own capital into the – into the program to – to do it..my view was – and that of my team – our preference was to remain a public company and none of us…had any comfort investing with private equity groups.*"[85]

145. However, as plainly stated in the Watt Deposition, the Officer Defendants were utterly unwilling to risk their own money in the operations of the Debtors despite their own willingness to gamble with the capital of others.

Question: "*What happened with Morgan Stanley negotiations at this point? Had they stalled?*"

Watt Answer: "*Yes*."

Question: "*And that was because of their requirement that the management put in their own money?*"

Watt Answer: "*Yes*."[86]

---

[85] Watt Deposition 133

[86] Watt Deposition p. 148

### H. Dune's Bankruptcy Proceeding, Confirmation of Plan of Liquidation, And Creation of Plan Trust

146. On March 8, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

147. On March 20, 2015, the United States Trustee appointed an official committee of unsecured creditors (the "***Creditors' Committee***") of Dune, consisting of Crescent Energy Services; Zedi US, Inc.; and Island Operating Company, Inc.

148. Following an auction conducted on June 30, 2015, the Bankruptcy Court entered an order authorizing the sale of Dune's Garden Island Bay and Bateman fields to Trimont Energy (Now), LLC for $1 on July 10, 2015 [Docket No. 378].

149. Additionally on July 10, 2015, the Bankruptcy Court entered an order authorizing the sale of all of the Debtors' assets excluding the Garden Island Bay and Bateman fields for $19 million to White Marlin Oil and Gas Company, LLC [Docket No. 379].

150. The Debtors filed the Plan which was confirmed pursuant to the Confirmation Order entered on September 15, 2015.

151. Pursuant to the Plan, and a Liquidating Trust Agreement executed in implementation of the Plan, Plaintiff Dan Lain has been named as the Plan Trustee by the Trust formed for the benefit of Dune's creditors. Pursuant to Section 9.3 of the Plan, the Liquidating Trustee has the power and duty to, *inter alia*, prosecute Derivative Litigation Claims (defined in the Plan) not expressly released under the Plan. Under Section 1.76 of the Plan, Derivative Litigation Claims are any claim, cause of action, demand, or any other right to payment derivative of or from the Debtors that is Estate Property (defined in the Plan).

**COUNT I**

**(Breach of Statutory Fiduciary Duty -- Texas Bus. Org. Code §21.401; Against Director Defendants)**

145. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

146. As directors of Dune, the Director Defendants owed Dune fiduciary duties of due care and loyalty. Because Dune was insolvent, the Director Defendants also owed fiduciary duties to Dune's creditors, as the ultimate bearers of risk and beneficiaries of any residual value. Under Texas Law, a director must handle his corporate duties with such care as "an ordinarily prudent man would under the circumstances" and must act in good faith and must not allow his personal interests to prevail over the interests of the corporation.

147. As described in detail above, the Director Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, instructed management to ignore potential offers for above the trading price of Dune's stock, reported overstated reserve amounts on Dune's financial information and failed to consummate viable transactions with other parties.

148. As a result of the Director Defendants breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Director Defendants in an amount to be determined at trial.

**COUNT II**

**(Breach of Statutory Fiduciary Duty – Texas Bus. Org. Code §21.401; Against Officer Defendants)**

149. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

150. As officers of Dune, the Officer Defendants owed Dune fiduciary duties of due care and loyalty. Because Dune was insolvent, the Officer Defendants also owed fiduciary duties to Dune's creditors, as the ultimate bearers of risk and beneficiaries of any residual value. Under Texas Law, a director must handle his corporate duties with such care as "an ordinarily prudent man would under the circumstances" and must act in good faith and must not allow his personal interests to prevail over the interests of the corporation.

151. As described in detail above, the Officer Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, reported overstated reserve amounts on Dune's financial information, focused on self-interested transactions and failed to consummate viable transactions with other parties.

152. As a result of the Officer Defendants breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Officer Defendants in an amount to be determined at trial.

**<u>COUNT III</u>**

**(Breach of Statutory Fiduciary Duty – Delaware General Corporation Law §141(a); Against Director Defendants)**

153. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

154. As directors of Dune, the Director Defendants owed Dune fiduciary duties of due care and loyalty. Because Dune was insolvent, the Director Defendants also owed fiduciary duties to Dune's creditors, as the ultimate bearers of risk and beneficiaries of any residual value. Under Texas Law, a director must handle his corporate duties with such care as "an ordinarily prudent

man would under the circumstances" and must act in good faith and must not allow his personal interests to prevail over the interests of the corporation.

155. As described in detail above, the Director Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, instructed management to ignore potential offers for above the trading price of Dune's stock, reported overstated reserve amounts on Dune's financial information and failed to consummate viable transactions with other parties.

156. As a result of the Director Defendants breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Director Defendants in an amount to be determined at trial.

## COUNT IV

**(Breach of Statutory Fiduciary Duty – Delaware General Corporation Law §141(a); Against Officer Defendants)**

157. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

158. As officers of Dune, the Officer Defendants owed Dune fiduciary duties of due care and loyalty. Because Dune was insolvent, the Officer Defendants also owed fiduciary duties to Dune's creditors, as the ultimate bearers of risk and beneficiaries of any residual value. Under Texas Law, a director must handle his corporate duties with such care as "an ordinarily prudent man would under the circumstances" and must act in good faith and must not allow his personal interests to prevail over the interests of the corporation.

159. As described in detail above, the Officer Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and

projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, reported overstated reserve amounts on Dune's financial information, focused on self-interested transactions and failed to consummate viable transactions with other parties.

160. As a result of the Officer Defendants breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Officer Defendants in an amount to be determined at trial.

**COUNT V**

**(Common Law Breach of Fiduciary Duty; Against Director Defendants)**

161. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

162. As directors of Dune, the Director Defendants owed fiduciary duties to the Debtors and their creditors to exercise duties of utmost loyalty and good faith and to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of the Debtors' businesses and financial affairs. These fiduciary duties include the duty of utmost loyalty and good faith and the obligation to act with due care and to deal honesty and fairly with the Debtors, their assets and their creditors.

163. At all relevant times, the Debtors were insolvent or within the zone of insolvency.

164. As described in detail above, the Director Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, instructed management to ignore potential offers for above the trading price of

Dune's stock, reported overstated reserve amounts on Dune's financial information and failed to consummate viable transactions with other parties.

165. As a result of the Director Defendants breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Director Defendants in an amount to be determined at trial.

**COUNT VI**

**(Common Law Breach of Fiduciary Duty; Against Officer Defendants)**

166. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

167. As officers of Dune, the Officer Defendants owed fiduciary duties to the Debtors and their creditors to exercise duties of utmost loyalty and good faith and to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of the Debtors' businesses and financial affairs. These fiduciary duties include the duty of utmost loyalty and good faith and the obligation to act with due care and to deal honesty and fairly with the Debtors, their assets and their creditors.

168. At all relevant times, the Debtors were insolvent or within the zone of insolvency.

169. As described in detail above, the Officer Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, instructed management to ignore potential offers for above the trading price of Dune's stock, reported overstated reserve amounts on Dune's financial information, focused on self-interested transactions and failed to consummate viable transactions with other parties.

170. As a result of the Director Defendants breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Director Defendants in an amount to be determined at trial.

**COUNT VII**

**(Breach of Duty Not to Make Improper Use of Information to Gain Improper Advantage; Against Officer Defendants)**

171. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

172. If a corporate opportunity is presented to the company, a director may not take advantage of it for personal gain, unless the company decides not to pursue it and, the director notifies the board and shareholders and is given permission participate in the transaction.

173. As described in more detail above, the Officer Defendants pursued transactions which would allow them to retain their positions and pursued self-interested deals such as Eos. Watt and other officers focused significant amount of time and resources on deals which involved management retaining their positions in the new firm.

174. In fact Watt, Smith, and Craig formed a side deal where they would form a Houston-based corporate team for Eos which would be charged with developing the infrastructure for a NYSE listing of Eos Petro.

175. Their pursuit of such transactions were at the expense of the other stakeholders, who would have been made whole had the Officer Defendants focused on consummating other closeable transactions.

176. As a result of the Officer Defendants' improper use of information to gain improper advantage, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors in an amount to be determined at trial.

## COUNT VIII

**(Violation of the Trust Fund Doctrine; Against All D&O Defendants)**

177. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

178. The principle of judicial invention states corporate assets are held as a trust fund for the benefit of shareholders and creditors and that corporate officers have a fiduciary duty to deal with them properly.

179. As described in detail above, the Defendants allowed the value of Dune to dissipate during their tenure due to their breach of fiduciary duties.

180. As a result of the Defendants violation of the Trust Fund Doctrine, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors against the Defendants in an amount to be determined at trial.

## COUNT IX

**(Corporate Waste; Against Director Defendants)**

181. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

182. Directors have a duty not to waste corporate assets.

183. As described in detail above, the Director Defendants wasted resources on the Goldking Acquisition due to overpaying based on environmental liabilities that existed and questions regarding reserves which were not properly diligence; transactions that were not closeable (e.g., Shoreline and Eos) and thus unrealistic and unattainable; payment of compensation when the board was not independent, did not uphold their fiduciary duty, and did not act in best interest of creditors.

184. As a result of this corporate waste by the Director Defendants, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors from them in an amount to be determined at trial.

**COUNT X**

**(Corporate Waste; Against Officer Defendants)**

185. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

186. Officers of a company have a duty not to waste corporate assets.

187. As described in detail above, the Officer Defendants wasted resources on the Goldking Acquisition due to overpaying based on environmental liabilities that existed and questions regarding reserves which were not properly diligence; transactions that were not closeable (e.g., Shoreline and Eos) and thus unrealistic and unattainable; payment of compensation when board was not independent, did not uphold fiduciary duty, and did not act in best interest of creditors; payment of salaries to officers that were self-interested in pursuing transactions where they would benefit most individually at the detriment of creditors.

188. As a result of this corporate waste by the Officer Defendants, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors from them in an amount to be determined at trial.

**COUNT XI**

**(Negligence; Against All D&O Defendants)**

189. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

190. The Defendants failed to exercise reasonable care throughout their tenure with Dune.

191. As described in more detail above, the Defendants failed to perform adequate due diligence in the Goldking Acquisition (specifically related to environmental liabilities and projected financial information), mismanaged Dune's environmental liabilities, failed to maintain an independent Board of Directors, performed an insufficient assessment of a viable offer from EPL in early 2012, instructed management to ignore potential offers for above the trading price of

Dune's stock, reported overstated reserve amounts on Dune's financial information, focused on self-interested transactions and failed to consummate viable transactions with other parties.

192. As a result of the negligence by the Defendants, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors from them in an amount to be determined at trial.

**COUNT XII**

**(Assumpsit; Against All D&O Defendants)**

193. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

194. The D&O Defendants have been unjustly enriched at the expense of the Debtors and their creditors, by receipt of the compensation, due to the extensive wrongful conduct described above.

195. The D&O Defendants are in possession of money which, in equity and good conscience, does not belong to them.

196. In equity and good conscience, the D&O Defendants should not retain the money and it should be turned over to Plaintiff in an amount to be determined at trial.

**COUNT XIII**

**(Unjust Enrichment; Against Director Defendants)**

197. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

198. As described in more detail above, the Director Defendants' conduct on the board was at the expense of the other stakeholders, who would have been made whole had the they focused on consummating other closeable transactions.

199. The Director Defendants were enriched by retaining their board positions in addition to their compensation.

200. Director Defendants knew that they received a benefit and should reasonably have expected to repay the Debtors and/or the Debtors' creditors.

201. Director Defendants accepted or retained the benefits without paying for its value.

202. Allowing the Director Defendants to retain the benefits they received would be unjust and result in unjust enrichment.

203. The Debtors and their creditors have no adequate remedy at law.

204. As a result of the Director Defendants' unjust enrichment, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors in an amount to be determined at trial.

## COUNT XIV

### (Unjust Enrichment; Against Officer Defendants)

205. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

206. As described in more detail above, the Officer Defendants pursued transactions which would allow them to retain their positions and pursued self-interested deals such as Eos. Watt and other officers focused significant amounts of time and resources on deals which involved management retaining their positions in the new firm.

207. In fact Watt, Smith, and Craig formed a side deal where they would form a Houston-based corporate team for Eos which would be charged with developing the infrastructure for a NYSE listing of Eos Petro.

208. Their pursuit of such transactions were at the expense of the other stakeholders, who would have been made whole had the Officer Defendants focused on consummating other closeable transactions.

209. The Officer Defendants were enriched by retaining their positions in addition to their compensation and salaries.

210. Officer Defendants knew that they received a benefit and should reasonably have expected to repay the Debtors and/or the Debtors creditors.

211. Officer Defendants accepted or retained the benefits without paying for its value.

212. Allowing the Officer Defendants to retain the benefits they received would be unjust and result in unjust enrichment.

213. The Debtors and their creditors have no adequate remedy at law.

214. As a result of the Officer Defendants' unjust enrichment, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors in an amount to be determined at trial.

## COUNT XV

**(Constructive Fraudulent Transfer – 11 U.S.C. §§544(b), 548(a)(1)(B), 550, 551 and as applicable Texas Bus. & Com. Code §24.005(a)2; Against All D&O Defendants – Constructive Fraud)**

215. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

216. Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

217. The transfers of compensation to the D&O Defendants represented transfers of an interest of Dune in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional compensation that Plaintiff later discovers.

218. Dune did not receive reasonably equivalent value in exchange for transferring the compensation to the D&O Defendants.

219. At the time of Dune's transfers of compensation to the D&O Defendants, Dune was insolvent or became insolvent as a result of such transfers.

220. At the time of Dune's transfers of compensation to the D&O Defendants, Dune was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

221. At the time of Dune's transfers of compensation to the D&O Defendants, Dune intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

222. The compensation transfers were made to or for the benefit of the D&O Defendants.

223. Dune's transfers of compensation to the D&O Defendants should be avoided pursuant to Bankruptcy Code section 548.

224. Under Bankruptcy Code section 550 and Texas Bus. & Com. Code §24.005(a)2, Plaintiff may recover compensation from the D&O Defendants as initial, immediate and/or mediate transferees.

## COUNT XVI

**(Constructive Fraudulent Transfer – 11 U.S.C. §§544(b), 548(a)(1)(B), 550, 551 and as applicable 6 Del. C. §1304(a)(2); Against All D&O Defendants – Constructive Fraud)**

225. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

226. Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

227. The transfers of compensation to the D&O Defendants represented transfers of an interest of Dune in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional compensation that Plaintiff later discovers.

228. Dune did not receive reasonably equivalent value in exchange for transferring the compensation to the D&O Defendants.

229. At the time of Dune's transfers of compensation to the D&O Defendants, Dune was insolvent or became insolvent as a result of such transfers.

230. At the time of Dune's transfers of compensation to the D&O Defendants, Dune was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

231. At the time of Dune's transfers of compensation to the D&O Defendants, Dune intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

232. The compensation transfers were made to or for the benefit of the D&O Defendants.

233. Dune's transfers of compensation to the D&O Defendants should be avoided pursuant to Bankruptcy Code section 548.

234. Under Bankruptcy Code section 550 and the Delaware Uniform Fraudulent Transfer Act – Delaware Code Title 6 §1304(a)(2), Plaintiff may recover compensation from the D&O Defendants as initial, immediate and/or mediate transferees.

## COUNT XVII

**(Conduct Ultra Vires*;* Against Defendant Robert A. Schmitz)**

235. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

236. As described in more detail above, Robert A. Schmitz, the non-executive chairman of the Board after 2011, undertook executive power beyond the scope of his authority without the full and proper sanction of the Board. His efforts to speak to Dune's shareholders without advising the company's executives, to intervene with the Debtors' investment bankers, to require the CEO and Board committees to report to him individually, and in other ways control the decisions of management were actions ultra vires.

237. As a result of the conduct ultra vires of Defendant Robert A. Schmitz, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors from them in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests entry of judgment on the Petition as follows:

A. On Counts I and II, awarding Plaintiff judgment, pursuant to Texas Bus. & Com. Code §21.401 against the Director Defendants and the Officer Defendants, jointly and severally, for damages caused to the Debtors and their creditors, as a result of the breaches of their fiduciary duties and self-dealing in an amount to be determined at trial;

B. On Counts III and IV, awarding Plaintiff judgment, pursuant to Delaware General Corporation Law §141(a) against the Director Defendants and the Officer Defendants, jointly and severally, for damages caused to the Debtors and their creditors, as a result of the breaches of their fiduciary duties and self-dealing in an amount to be determined at trial;

C. On Counts V and VI, awarding Plaintiff judgment against the Director Defendants and the Officer Defendants, jointly and severally, for damages caused to the Debtors and their creditors, as a result of the breaches of their fiduciary duties and self-dealing in an amount to be determined at trial;

D. On Count VII, awarding Plaintiff judgment against all the D&O Defendants, jointly and severally, for damages caused to the Debtors and their creditors, by improper use of information to gain improper advantage in an amount to be determined at trial;

E. On Count VIII, awarding Plaintiff judgment against all the D&O Defendants, jointly and severally, for damages caused to the Debtors and their creditors, in violation of the trust fund doctrine in an amount to be determined at trial;

F. On Counts IX and X, awarding Plaintiff judgment against the Director Defendants and the Officer Defendants for damages caused to the Debtors and their creditors as a result of corporate waste in an amount to be determined at trial;

G. On Count XI, awarding Plaintiff judgment against all the D&O Defendants for damages caused to the Debtors and their creditors as a result of their negligence in an amount to be determined at trial;

H. On Counts XII, XIII and XIV awarding Plaintiff judgment against all D&O Defendants for turnover of money which, in equity and good conscience, does not belong to them, based on the doctrines of assumpsit and unjust enrichment, in an amount to be determined at trial

I. On Count XV, awarding Plaintiff judgment, pursuant to sections 544(b), 548(a)(1)(B), 550 and 551 of the Bankruptcy Code and Texas Bus. & Com. Code section 24.005(a)2, against all D&O Defendants for recovery of constructive fraudulent transfers against all the Defendants jointly and severally, in amounts to be determined at trial;

J. On Count XVI, awarding Plaintiff judgment, pursuant to sections 544(b), 548(a)(1)(B), 550 and 551 of the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act – Delaware Code Title 6 §1304(a)(2), against all D&O Defendants for recovery of constructive fraudulent transfers against all the Defendants jointly and severally, in amounts to be determined at trial;

K. On Count XVII, awarding Plaintiff judgment against Defendant Robert A. Schmitz for damages caused to the Debtors and their creditors for his conduct ultra vires in an amount to be determined at trial;

L. Awarding Plaintiff interest, costs, and attorney's fees; and

M. Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 6, 2017

Respectfully Submitted,

*/s/ Sam Stricklin*

Samuel Stricklin
Texas State Bar No. 19397050
**Stricklin Law**
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, TX 75082
Telephone: (972) 238-8687
Cell: (469) 601-4601
Email:
sam.stricklin@stricklaw.pro